[Crim. No. 18581. Second Dist., Div. Five. Feb. 8, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
LOUIS SCHINDLER, Defendant and Appellant.

### COUNSEL

Harvey A. Schneider for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Bradley A. Stoutt and Norman H. Sokolow, Deputy Attorneys General, for Plaintiff and Respondent.

### OPINION

**KAUS, P. J.** — In an information filed June 16, 1967, defendant was charged with the murder of his wife June. After a jury trial he was convicted of second degree murder. On appeal the conviction was reversed (*People* v. *Schindler,* 273 Cal.App.2d 624 [78 Cal.Rptr. 633]), but by then defendant had spent considerable time in prison.

After a second jury trial defendant was convicted of voluntary manslaughter. Again sentenced to state prison, he appeals. Pending the present appeal he is at liberty on his own recognizance.

Apart from additional psychiatric testimony, by prison psychiatrists and other personnel, there is no material difference between the evidence adduced at the two trials. We therefore merely refer to the summary of the evidence as it is related in Presiding Justice Roth's opinion on the first appeal.

Defendant's contentions on this appeal are summarized as follows in his opening brief:

"1. The Court Erroneously Denied Appellant's Motion to Dismiss the Information and Erroneously Denied Appellant's Motion for Acquittal.

"2. The Court Erred in Refusing to Dismiss the Information on the Ground that Appellant had Previously been Acquitted of the Offense Charged and/or had been Placed Once in Jeopardy with respect to the Offense Charged.

"3. The Court Erred in making Certain Rulings Relating to the State of Mind Exception to the Hearsay Rule.

"4. The Court Committed Reversible Error in Refusing to Admit Certain Exhibits into Evidence.

"5. The Court Committed Reversible Error in Instructing the Jury.

"6. The Court Committed Reversible Error in Explaining the Verdicts to the Jury.

"7. The Court Erred in Denying Probation to Appellant in that:

"(a) Because Appellant Served More Time in Prison than the Minimum Time Appellant would have been Required to Serve to be Eligible for Parole in Light of the Offense Committed by him, the Provisions of Penal Code § 1203 relating to the Grant of Probation only if certain Conditions were met were Inapplicable in Appellant's Case.

"(b) Appellant did not use a Deadly Weapon upon the Victim within the meaning of Penal Code § 1203; Accordingly, the 'Use of a Deadly Weapon' Provisions of Penal Code § 1203 were Inapplicable to Appellant's Case and did not Preclude the Court from Granting Probation to Appellant.

"(c) Under a Proper Construction of Penal Code § 1203, Appellant was Entitled to Probation under that Section."

The numbered parts of this opinion correspond with the numbers in the above specifications of error.

1.

■ The opinion on the first appeal contains the following passage:

"Appellant further contends that the complaint filed in the municipal court did not state facts sufficient to provide the magistrate with sufficient information to issue a warrant for appellant's arrest, and by reason thereof, all subsequent proceedings in the case were without color of law. (*People* v. *Sesslin,* 68 Cal.2d 418, 425-426 [67 Cal.Rptr. 409, 439 P.2d 321].) The complaint on information and belief charges the crime of murder was committed by Louis Schindler. It is vague and subject to criticism. However, no objection was made at the preliminary hearing or the trial. (Cf. *People* v. *Butler,* 64 Cal.2d 842, 844 [52 Cal.Rptr. 4, 415 P.2d 819].) Obviously, no solid purpose could have been served by an objection." (*People* v. *Schindler, supra,* 273 Cal.App.2d at p. 644.)

At the second trial defendant did move to dismiss the information on *Sesslin* grounds. The motion was denied. The ruling was obviously correct. Defendant cannot point to any exploitation of what may have been an illegal arrest. How he got into the courtroom to be tried is immaterial. (*People* v. *Valenti,* 49 Cal.2d 199, 203 [316 P.2d 633].)

## 2.

At the trial, as well as here, defendant claimed that the first trial had placed him in jeopardy even as far as second degree murder is concerned. Defendant has standing to make the point even though he was only convicted of manslaughter. (*Price* v. *Georgia,* 398 U.S. 323, 331-332 [26 L.Ed.2d 300, 306-307, 90 S.Ct. 1757].) Nevertheless it is so obviously without merit that it requires no further discussion. (*In re McCartney,* 64 Cal.2d 830 [51 Cal.Rptr. 894, 415 P.2d 782]; *People* v. *Henderson,* 60 Cal.2d 482, 495-497 [35 Cal.Rptr. 77, 386 P.2d 677]; *Gomez* v. *Superior Court,* 50 Cal.2d 640, 643 [328 P.2d 976].)

## 3.

Over objection, Mrs. Laven, the wife of the victim's attorney, was permitted to testify that on the evening before the homicide she had a telephone conversation with June, during which June told her that the gun was missing from a linen closet. She was very upset about it and expressed fear for her safety. Similarly Mr. Laven's secretary was permitted to testify that a few days before her death June called her and said that the gun was missing from the closet and that defendant was going to kill her. In each case the jury was informed that the evidence was admitted only to prove the victim's state of mind.

The admissibility of this testimony was exhaustively discussed in the opinion which disposed of the first appeal. There the court distinguished cases such as *People* v. *Ireland,* 70 Cal.2d 522, 528-532 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323] and *People* v. *Lew,* 68 Cal.2d 774, 778-780 [69 Cal.Rptr. 102, 441 P.2d 942] on the basis that here defendant's claim of self-defense was an integral part of his defense. We agree.

In connection with his argument on the admissibility of the victim's statements, defendant complains that one of his witnesses, Mrs. Lurie, was not permitted to testify that about the same time defendant told her that he had removed the gun from its normal place in a commode and placed it in a closet, after June had expressed concern about the whereabouts of the gun.

The entire purpose of the testimony was to act as a background for admitted testimony concerning a call from the witness to June in which the witness related what defendant had told her about the gun, during which call June expressed no concern about its whereabouts. The testimony probably should have been admitted for that purpose. However defendant got all that he needed when his counsel and the prosecutrix stipulated that if

recalled to the witness stand he would testify to what he told the witness about the gun. The error, if any, was therefore harmless.

### 4.

Defendant's fourth point is a grab bag of complaints with respect to certain evidentiary rulings. We shall deal with them in the same summary fashion in which they are presented.

■ Defendant complains of the court's refusal to admit five exhibits (defendant's N, O, R, X and Y) because they would have impeached the maid Inger's testimony or supported that of Sam Schindler, his brother. Nowhere is it explained why that is so. No error is, therefore, shown.

■ June's brother gave very damaging testimony against defendant to the effect that defendant had once spoken of an intention to kill her. Two exhibits (defendant's "O" and "P") were letters by the brother addressed to the district attorney and the chief of police respectively, urging, in effect, vigorous prosecution. Defendant now claims that the letters would have impeached the brother's testimony in that there was nothing in them about the alleged threat. We are not, however, referred to any place in the record where the letters were ever offered. No error appears.

■ Complaint is made of the fact that the trial court refused admission to certain documents of the Department of Corrections concerning defendant while he was an inmate between the first and second trial. They consist of a psychotherapy report signed by senior psychologist Rivlin, a psychiatric evaluation by Jack Levitt, M.D., a psychiatric consultant, a social evaluation by one Francis V. Keegan and a psychological report signed by staff psychologist Gary Fisher. The only entrant in the exhibit who did not testify at the trial was the last mentioned Fisher.

To the extent that these reports duplicated the favorable testimony given at the trial, their rejection was obviously not prejudicial to the defense. On the other hand, the court might well have felt that on the whole the reports were prejudicial to the prosecution, for in the main they did not deal at all with defendant's mental state at the time of the homicide, but praised him as a model prisoner.[1]

■ Finally defendant claims that the court erred in permitting Richard Pihl, M.D., an employee of the coroner's office, to testify concerning the autopsy report. Doctor Pihl had not conducted the autopsy. At the time when he testified the doctor who actually did conduct the autopsy, K. E.

---

[1]Since defendant's brief does not refer us to the place in the record where the exhibit was offered and rejected we do not know the exact basis for the ruling.

Chapman, M.D., had not yet been a witness. In fact he was later called by the defense.

The objection to Doctor Pihl's testimony was that he was just reading the autopsy report to the jury. There was no objection to the admission of the report itself. The record, however, shows that the prosecution used the doctor's expertise to explain the contents of the report to the jury. In any event there is no indication in defendant's brief how he was harmed by the testimony. Again no error is shown.

## 5.

The court's instructions permitted the jury to reach a verdict of involuntary manslaughter only if it found the facts which constitute the elements of that crime as defined in section 192, subdivision 2 of the Penal Code. The instructions left no room for a finding of involuntary manslaughter based on the absence of an intent to kill due to diminished capacity.

Neither counsel nor we have been able to find a case not involving intoxication which holds that diminished capacity to form an intent to kill can reduce a homicide to involuntary manslaughter.[2] To be sure a dictum in *Poeple v. Mosher*, 1 Cal.3d 379, 390 [82 Cal.Rptr. 379, 461 P.2d 659] so suggests,[3] and the authors of CALJIC (3d ed. 1970) have so interpreted it. (CALJIC No. 8.48.) In view of the fact that we have reached the conclusion that the judgment must be reversed for reasons stated in the next part of this opinion, we feel that proper judicial restraint compels us not to venture an opinion. This is particularly so because the record in this case does not really contain any substantial evidence describing defendant as a person with diminished capacity to form an intent to kill. While counsel interpret certain portions of the psychiatric testimony as deviating from the strongly expressed conclusions that defendant was legally unconscious, the effort is strained. Any verdict based on a factual theory that defendant, though not unconscious and therefore not entitled to an acquittal, nevertheless suffered from diminished capacity to form an intent to kill, would have been a compromise verdict, rather than one based on evidence.

---

[2]Both the prosecution and the defense urged the trial court to give an instruction to the effect that diminished capacity could reduce the crime to involuntary manslaughter. Presumably such an instruction would have followed, at least in general terms, what now is CALJIC No. 8.48.

[3]". . . But the court proceeded to define involuntary manslaughter in such a way as to exclude the jury's consideration of involuntary manslaughter as the offense for which the jury should find defendant guilty if it determined that the defendant's mental capacity was diminished due to mental defect, mental illness, or intoxication such that the intent to kill as well as malice was rebutted. [Citation.]" (*People v. Mosher, supra,* 1 Cal.3d at p. 390.)

## 6.

■ Defendant complains that the court misdirected the jury when it explained the various possible verdicts.

When the jury retired, the court handed it, through the bailiff, four verdicts, blank as to date and signature. These verdicts were: "guilty of murder . . . in the second degree"; "guilty of voluntary manslaughter"; "guilty of involuntary manslaughter"; and "not guilty of murder as charged in the information."

After the court's instructions were completed it purported to instruct the jury on how to go about considering the various possible verdicts. The jury apparently did not quite understand what the court was telling it, for they asked for a "restatement" the next day. The court then instructed the jury further.

What the court was trying to tell the jury was that it should first consider the murder charge, and only consider manslaughter if it could not find defendant guilty or not guilty of murder.[4] Whether or not it is the business of the court to prescribe the jury room agenda, unfortunately in the course of the two charges on the subject, the court told the jury that once it got down to the consideration of manslaughter, it could no longer find the defendant not guilty. In its first charge it said: "The only finding upon which a not guilty verdict may be made is the basic charge of murder." Then later, after the jury returned, the court said with respect to voluntary manslaughter: "This may cause trouble to you; you do not make a finding of not guilty to manslaughter. You don't make a not guilty finding. The only finding is guilty if you arrive at it." This was followed by this rather puzzling statement: "Let me get that, too. Maybe you don't arrive at a guilty finding. That is the end of an inability of the jury to make a finding of guilty on the involuntary [sic] manslaughter, termination, you don't step over and say, 'do we not find guilty on involuntary manslaughter?' " Then again: "The only not guilty finding, if there is a finding to that effect is on the basic charge of murder."

A little later, with respect to involuntary manslaughter, the court said:

---

[4]In the course of its charge the court made an error favorable to the defendant. It said: "If you vote not guilty as charged that is the end of the lawsuit as far as the jury is concerned. You are through." That statement is, of course, correct if the crime, as charged, is deemed to include lesser included offenses. We doubt that the jury so understood it, and thus, in effect, the court told the jurors that if they all agreed that defendant was not guilty of murder, that was the end of the case and there was no need to consider manslaughter.

"You do not make a finding of not guilty of involuntary manslaughter. The only not guilty verdict that is before the jury would be the basic finding of not guilty as charged."

Putting these various instructions together it is plain that the jury was told that if it could not agree, one way or another, on the basic charge of murder, its only options were to find defendant guilty of voluntary or involuntary manslaughter.

· The prejudicial effect of these instructions was obviously heightened by the fact that no forms of verdict finding the defendant not guilty of voluntary or involuntary manslaughter were furnished to the jury. True, it is "no part of the duty of the judge to furnish forms of verdict to the jury." (*People* v. *Hill,* 116 Cal. 562, 570 [48 P. 711].) True further, that on the first appeal of this case it was held not to have been error to furnish the jury with a not guilty verdict only as to murder. (*People* v. *Schindler, supra,* 273 Cal.App.2d at p. 642.) It is, however, most definitely error to preclude the jury, by oral instructions, from finding the defendant not guilty of the lesser included offenses. In such a case there is no room for the presumption, referred to on the first appeal, "that if a jury is properly instructed, it will reach a proper verdict and write one or ask for one irrespective of whether they have all the verdict forms." (*People* v. *Schindler, supra,* 273 Cal.App.2d at p. 642.)

### 7.

If we did not have to reverse because of the error just discussed, it would still be necessary for us to vacate the sentence and remand the case for resentencing, for it is perfectly clear that the only reason why the court denied probation was that the district attorney's office would not concur in a grant. The court said unequivocally: "Now, I will state clearly for an appellate court that if I could grant probation, if I found the law permitted it, I would grant probation now . . . Now that is the way I would act, and I am convinced as a matter of law I can't act that way." The court then proceeded to permit defendant to remain at liberty on his own recognizance pending appeal.

The proceeding in question took place on April 13, 1970. The court therefore did not have the benefit of the Supreme Court's decision in *People* v. *Tenorio,* 3 Cal.3d 89 [89 Cal.Rptr. 249, 473 P.2d 993], decided on September 1, of that year, let alone the decision in *People* v. *Clay,* 18

Cal.App.3d 964 [96 Cal.Rptr. 213], decided about a year later, which made the *Tenorio* principle applicable to the grant of probation.

The judgment is reversed.

Aiso, J., and Reppy, J., concurred.

Petitions for a rehearing were denied February 22 and 29, 1972, and respondent's petition for a hearing by the Supreme Court was denied April 6, 1972.