[Crim. No. 5876. Fourth Dist., Div. Two. Apr. 17, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD JOHN LONG, Defendant and Appellant.

COUNSEL

John C. Nolan, under appointment by the Court of Appeal, Charles E. Ward, Public Defender, and Littleton M. Gunn, Deputy Public Defender, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Harley D. Mayfield and Bernard A. Delaney, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**GARDNER P. J.** — Defendant was convicted by a jury of first degree murder.

The decedent, a retired civil engineer and a widower for about nine years, was 73 years of age and lived in Yucca Valley. The defendant, age 22, lived in a nearby house trailer. The defendant and decedent were

friends and the defendant spent many evenings at the decedent's home watching television. On several occasions, the defendant had tried to borrow money from the decedent but the decedent would not loan him any.

On July 20, 1972, the body of the decedent was found on the floor of his living room. A footstool and pillow had been placed on his head, the pillow compressed down over his face. A blanket had been wrapped around his head in mummylike fashion. An electric cord and leather belt were around his neck. An examination by a pathologist revealed numerous head and facial lacerations and bruises, the latter consistent with strangulation which was the cause of death.

Defendant was arrested the next day in Twenty-Nine Palms. He was in possession of a watch, coins and a wallet containing some $200 in cash and some credit cards belonging to the decedent. After proper *Miranda* advisement and waiver, the defendant made a recorded statement which was substantially that to which he testified at trial. He also made a filmed reenactment of the incident which again was consistent with his trial testimony.

The defendant's version as reflected in the recorded statement, his trial testimony and a filmed reenactment was that he was a friend of the decedent and spent many evenings in the decedent's home listening to the decedent's ham radio and watching television; that on the day of the killing, the decedent was sitting beside the defendant watching television; that the decedent placed his hand on the defendant's leg and grabbed his groin area inflicting substantial pain; that this action infuriated the defendant; that he picked up a large metal bolt and struck the decedent several times. He then hit and kicked him and looped an appliance cord around his neck and pulled it until it snapped. The defendant said he did not go to the decedent's house with the intention of either killing or robbing him; that the beating was administered as the result of a homosexual approach; that the robbery was an afterthought; that the decedent did not strike back at any time in self-defense. After the decedent became unconscious, the defendant took his billfold and went to Twenty-Nine Palms where he was arrested the next day. In the billfold was approximately $200 which he spent on clothes to replace his bloody clothes and on drugs.

During the defendant's original statement to the officers, he consented to reenact the crime on sound film. However, he refused to return to the decedent's residence to do so but agreed to the reenactment in a vacant room at the sheriff's substation in Twenty-Nine Palms.

A psychiatrist testified for the defendant to the effect that the defendant was overcome by emotional anger at the homosexual approach, was irrational at the time of the beating, but that defendant knew what he was doing when he robbed the decedent. He also testified that the defendant was sane at the time of the killing although he had no malice or premeditation to kill.

In substance, the defendant's version was that, enraged by the homosexual approach of the decedent, he beat, kicked and choked him, then, as an afterthought, took his money and left.

As indicated, defendant was convicted by a jury of first degree murder.

On appeal, defendant contends:

## I.

THAT THE TRIAL COURT ERRED IN FAILING TO INSTRUCT SUA SPONTE ON INVOLUNTARY MANSLAUGHTER BASED ON EVIDENCE OF DIMINISHED CAPACITY TO HARBOR MALICE OR TO ENTERTAIN AN INTENT TO KILL.

The jury was instructed on first degree murder, second degree murder and voluntary manslaughter. No instruction was requested nor any given on involuntary manslaughter. Since, under no possible interpretation of the evidence, does this case fit either of the two categories of statutory involuntary manslaughter, we address ourselves solely to the concept of so-called nonstatutory involuntary manslaughter based on the concept of diminished capacity.

Since there is no evidence of intoxication, the issue is whether diminished capacity to form the intent to kill, caused by mental defect or mental illness, can reduce a homicide to involuntary manslaughter. This is apparently an issue of first impression. In *People* v. *Schindler,* 23 Cal.App.3d 369 [100 Cal.Rptr. 110], the court said: "Neither counsel nor we have been able to find a case not involving intoxication which holds that diminished capacity to form an intent to kill can reduce a homicide to involuntary manslaughter. [Fn. omitted.] To be sure a dictum in *People* v. *Mosher,* 1 Cal.3d 379, 390 [82 Cal.Rptr. 379, 461 P.2d 659] so suggests, [fn. omitted quoting *Mosher*] and the authors of CALJIC (3d ed. 1970) have so interpreted it. (CALJIC No. 8.48.)" (*People* v. *Schindler, supra,* at p. 376.) However, since the *Schindler* court had already reached the conclusion that the judgment was to be reversed "proper judicial restraint" compelled them not to render an opinion on the subject. We are denied such a luxury since we have determined that none of the other claimed errors are meritorious. Faced with this issue, we hold that diminished

capacity sufficient to reduce a homicide to involuntary manslaughter may be based on mental defect or mental illness absent evidence of intoxication.

In *People* v. *Mosher, supra,* 1 Cal.3d 379, the court said at page 390: "But the court proceeded to define involuntary manslaughter in such a way as to exclude the jury's consideration of involuntary manslaughter as the offense for which the jury should find defendant guilty if it determined that the defendant's mental capacity was diminished due to *mental defect, mental illness, or* intoxication such that the intent to kill as well as malice was rebutted. (Citation.)" [Italics added.]

While, as the court pointed out in *Schindler,* the above statement is dictum, the editors of CALJIC, following the publication of *Mosher,* prepared and published Instruction No. 8.48 (1971 revision) which reads as follows: "Involuntary manslaughter is the unlawful killing of a human being without malice aforethought and without an intent to kill.

"A killing is unlawful within the meaning of this instruction if it occurred:

"(1) During the commission of a misdemeanor which is inherently dangerous to human life; or

"(2) In the commission of an act ordinarily lawful which involves a high degree of risk of death or great bodily harm, without due caution and circumspection.

"There is no malice aforethought and intent to kill if by reason of diminished capacity caused by mental illness, mental defect, *or* unconsciousness resulting from voluntary intoxication,[1] the defendant did not have the mental capacity to harbor malice aforethought and to form an intent to kill." [Italics added.]

The editors of CALJIC state in a footnote to CALJIC No. 8.48 that that instruction should be given *sua sponte* if there is evidence that due to diminished capacity the defendant had neither malice nor intent to kill.

It appears clear that under the concept of diminished capacity as developed by the courts of this state, CALJIC No. 8.48 (1971 revision) is a correct statement of the law insofar as it concerns diminished capacity due to mental defect or mental illness. If an individual by reason of diminished capacity caused by mental illness, mental defect *or* unconsciousness re-

---

[1]To support a finding of involuntary manslaughter based on voluntary intoxication that voluntary intoxication must reach the state of unconsciousness. (*People* v. *Roy,* 18 Cal.App.3d 537 [95 Cal.Rptr. 884].)

sulting from voluntary intoxication does not have the mental capacity to premeditate, to deliberate, to harbor malice aforethought or to form an intent to kill, he can be guilty only of the offense of involuntary manslaughter. Once that mental state has been attained, it matters not whether it is the result of mental illness, mental defect or unconsciousness resulting from voluntary intoxication. While, as indicated, there have been no cases directly involving *mental illness* or *mental defect,* we can find no rational distinction between those situations and that of unconsciousness resulting from voluntary intoxication. Thus, although the above quotation from *Mosher* is but dictum, it is a logical extension of the basic tenet of diminished capacity.

Therefore, in a homicide case if there is substantial evidence of mental illness or mental defect sufficient to negate the ability of the defendant to premeditate, to deliberate, to harbor malice aforethought *or* to form an intent to kill, it is the duty of the trial judge to instruct the jury *sua sponte* that the offense can be no greater than involuntary manslaughter.

■ Thus, we address ourselves to the question of whether there was in the instant case substantial evidence of mental illness or mental defect sufficient to alert the trial judge that this was an issue. (*People* v. *Cram,* 12 Cal.App.3d 37, 41 [90 Cal.Rptr. 393].)

Under the defendant's version of the incident, he is clearly guilty of voluntary manslaughter. Nothing in his testimony even hinted at diminished capacity. At one stage in his filmed reenactment, he said, "In my mind I was trying to kill him." Thus, we must examine the testimony of the psychiatrist who testified on behalf of the defendant to ascertain whether, with the gift of hindsight, there is in that testimony evidence of such substantial nature that the trial judge should have been alerted to the fact that an issue existed that by reason of a mental defect or mental illness the defendant could not harbor an intent to kill.

The psychiatrist was obviously called to rebut any finding of premeditation or malice. He accepted the defendant's story of the homosexual advance and, based on that history, testified that at the time of the entire incident the defendant was overcome with an emotional state of anger and was irrational at the time of the beating; that the homosexual approach caused him to lose his temper initially and then because of his compulsiveness and lack of control he continued with the beating. The psychiatrist further testified that "the defendant had no anger or malice toward the victim, at least predating this incident"; that there was no evidence of premeditation; that the defendant's controls were very poor; that in response to the initial approach, he "whipped out as a response and began to hit the

decedent and kept on hitting him"; that he had a history of being extremely nervous and using various drugs including alcohol, but that he was not deranged from the use of alcohol nor was there any evidence of brain damage as the result of the use of drugs; that there was not enough use of drugs or alcohol during the time of the incident to account for it on the basis of intoxication from either source; that he was not a sociopath but was "certainly heading in that direction"; that defendant was sane at the time of the incident; that he was "not guilty of first degree murder but that he had committed a second degree murder or perhaps even a manslaughter." However, the doctor testified to nothing which would indicate that by reason of a mental illness or mental defect the defendant had a diminished capacity to form an intent to kill. The closest he came to it was when asked whether the defendant had formed an intent to kill, the doctor said that he did not believe "his purpose was to kill." This would be completely consistent with the defendant's testimony of rage at the homosexual approach, and in no way indicates that the defendant lacked an intent to kill because of a mental illness or a mental defect.

Thus, there was nothing in the doctor's testimony which would afford substantial evidence that because of a mental defect or mental illness the defendant did not harbor an intent to kill. Therefore, it was not incumbent upon the trial judge *sua sponte* to instruct on involuntary manslaughter based on any concept of diminished capacity.

One more issue must be disposed of before the seemingly interminable discussion of this issue grinds to a halt.

The judge did give CALJIC No. 8.77 on the general subject of diminished capacity. This instruction advises the jury that if by reason of diminished capacity the defendant lacks the ability to premeditate, harbor malice, or have an intent to kill, he cannot be found guilty of either murder or voluntary manslaughter. In *People* v. *Castillo,* 70 Cal.2d 264 at page 270 [74 Cal.Rptr. 385, 449 P.2d 449], the court said: "Indeed, the trial court instructed the jury on the significance of the diminished capacity defense in other respects. The court must have concluded that sufficient evidence had been adduced to compel an instruction on diminished capacity because it gave such an instruction, although it was an inadequate one. Accordingly, in failing to instruct on nonstatutory voluntary manslaughter the court erred." (See also *People* v. *Rodriguez,* 274 Cal.App.2d 487, 496 [79 Cal.Rptr. 187].)

Since the court gave an instruction on the subject of diminished capacity, the question then presented is whether it "must have concluded" that sufficient evidence had been adduced to compel an instruction on

diminished capacity insofar as that concept pertains to involuntary manslaughter. We hold that it did not.

CALJIC No. 8.77 was clearly called for under the testimony of the psychiatrist. Under the testimony of the psychiatrist, the issue of diminished capacity insofar as it pertained to premeditation, deliberation and malice was clearly presented. However, the giving of this instruction does not necessarily indicate that the judge felt that there was substantial evidence of diminished capacity or intent to kill insofar as the issue of involuntary manslaughter was concerned. Simply because an issue of diminished capacity to premeditate, deliberate and have the ability to harbor malice is presented does not mean that there was substantial evidence of diminished capacity of an intent to kill.

Defendant's other contentions are of no precedential value and may, hopefully, be disposed of more briefly.

## II.

### A Violation of a Prediscovery Order

■ This contention is without merit.

Defendant made a request for: "3. All films involving the defendant or related to the defendant or to this case (including more specifically opportunity to view film reinactment (sic) of crime by defendant)."

In reply to this, a memorandum was submitted by the prosecution which .stated: "3. The only film involving the defendant is the filmed reenactment. I have advised Detective Cox and, by virtue of this memo, am advising Lt. Grounds that the defendant's attorney is to be allowed to review this reenactment. All that is required is that the defendant's attorney work with the officer in making a satisfactory appointment for both parties."

The prosecution made available to the defense the filmed reenactment of the crime. At trial, it developed that the prosecution also had a film of the murder scene and of the victim. When this developed, the defense was afforded an opportunity to review that film, and after a review of that film, defense counsel made no objection to that film on any grounds associated with belated discovery. The only objection was as to its probative value versus its prejudicial effect on the jury. Failing to make a proper objection at the trial level precludes raising this matter on appeal. (Evid. Code, § 353.) If trial counsel did not feel put upon by this omission on the part of the prosecution, it is too late for appellate counsel, microscopically searching the record for error (as is his duty), to successfully make an issue of it.

## III.

PREJUDICIAL ERROR WAS COMMITTED IN ADMITTING INTO EVIDENCE NUMEROUS PHOTOGRAPHS OF THE CRIME SCENE, TOGETHER WITH PHYSICAL OBJECTS SUCH AS THE BLOODSTAINED BLANKET, THE BELT, ETC.

■  This contention is without merit.

Preliminarily, two observations might be made: (1) murder is seldom pretty,[2] and pictures, testimony and physical evidence in such a case are always unpleasant; and (2) many attorneys tend to underestimate the stability of the jury. A juror is not some kind of a dithering nincompoop, brought in from never-never land and exposed to the harsh realities of life for the first time in the jury box. There is nothing magic about being a member of the bench or bar which makes these individuals capable of dispassionately evaluating gruesome testimony which, it is often contended, will throw jurors into a paroxysm of hysteria. Jurors are our peers, often as well educated, as well balanced, as stable, as experienced in the realities of life as the holders of law degrees. The average juror is well able to stomach the unpleasantness of exposure to the facts of a murder without being unduly influenced. The supposed influence on jurors of allegedly gruesome or inflammatory pictures exists more in the imagination of judges and lawyers than in reality.

In this case, we have reviewed the pictures, both still and motion. They are neither "better" nor "worse" than those in the average murder case. Gruesome, yes, but factually gruesome. However, they are not unnecessarily hideous, ghastly, horrible or dreadful. Inflammatory? Definitely not. They are fair, if unpleasant, representations of an unpleasant situation which happened to be brought on by this defendant's actions. Their probative value in showing the jury exactly what happened clearly outweighs any speculative prejudicial effect. The photographs used in this case are not so gruesome or overdone as to "unnecessarily inflame the passion of the jurors," to quote the defendant.

## IV.

THE FILMED REENACTMENT OF THE CRIME WAS IMPROPERLY ADMITTED INTO EVIDENCE BECAUSE (A) NO PROPER FOUNDATION WAS LAID; (B) THE FILMING TOOK PLACE AT THE SHERIFF'S SUBSTATION RATHER THAN AT THE MURDER SCENE; AND (C) THE DEFENDANT WAS NOT PROPERLY ADVISED OF HIS MIRANDA RIGHTS BEFORE THE START OF THE FILM.

■  This contention is without merit.

---

[2] As the defendant said of the decedent, "He was a pretty ugly sight."

(A) A proper foundation was laid. An officer testified that the film was a fair and accurate depiction of what was said and done, and said it was in no way edited or altered.

(B) The reenactment took place at the sheriff's substation rather than in the victim's home at the request of the defendant, not the officers. The defendant is hardly in a position to complain because the officers complied with his request.

(C) A *Miranda* advisement and waiver were secured prior to the initial interview which preceded the filmed reenactment and this was repeated in the film itself before any on-film questioning.

In summary, the facts elicited in the filmed reenactment were relevant. The participation by the defendant was voluntary, and the source and contents were properly authenticated. (*People* v. *Dabb,* 32 Cal.2d 491 [197 P.2d 1].) The fact that the reenactment took place at the sheriff's substation rather than the victim's home was made clear to the jury and they were quite able to keep this distinction in mind in evaluating this testimony.

## V.

In Closing Argument the District Attorney "Directed" the Jury to Disregard All the Defendant's Testimony.

This contention is without merit.

A careful review of the entire transcript of the district attorney's argument fails to reveal one defense objection on the ground of misconduct. Lacking any such objection, the court was hardly in a position to give a proper advisement. ■ Misconduct of the district attorney may not successfully be assigned as error on appeal if it has not been so assigned at trial unless the case is closely balanced and presents grave doubts as to the defendant's guilt, and the misconduct contributed materially to the verdict, or unless the harmful results of the misconduct could not have been obviated by a timely admonition to the jury. (*People* v. *Hathcock,* 8 Cal.3d 599, 609 [105 Cal.Rptr. 540, 504 P.2d 476].) Here, the case was not evenly balanced; the evidence pointing to guilt was overwhelming. As we will point out, there was no misconduct which contributed to the verdict and, lacking an objection, the trial court was hardly in a position to cure any alleged prejudice of which the defendant now complains.

The evidence is clear that either a murder or a voluntary manslaughter took place. We cannot conceive that the now complained of remarks con-

tributed in any way to the verdict and certainly any harmful results could have been obviated by a timely and proper objection, followed by an admonition. Under any circumstances, the argument of the prosecutor remained within permissible limits. He indicated forcefully, as was his duty, that the evidence cast grave doubt on the veracity of the defendant. At no time did he go outside the record or impermissibly give his personal opinion as to the defendant. There was no impropriety in the district attorney's argument. The reasonable objectivity standard placed on the district attorney does not mean that his argument must only be a pallid recitation of the facts. He is entitled to strike hard blows, but not foul ones. Here, the district attorney did strike hard blows; he did not strike foul ones.

## VI.

A STATEMENT MADE BY THE DEFENDANT WHILE BEING TRANSPORTED IN A POLICE VEHICLE TO SAN BERNARDINO, FOLLOWING THE POLICE INTERVIEW AND FILMED REENACTMENT AT TWENTY-NINE PALMS, WAS IMPROPERLY ADMITTED.

This statement was to the effect that a lot of homosexuals lived in the small desert communities. The defendant contends that the statement was received without proper *Miranda* foundation. This contention is without merit.

(A) A proper *Miranda* warning had been given and proper waiver had been obtained prior to the statement.

(B) Under any circumstances, the statement was not the product of any interrogation but was spontaneous and volunteered by the defendant as an interruption into a conversation between the transporting officers.

## VII.

THE JUDGE OMITTED GIVING CALJIC No. 8.30 PERTAINING TO SECOND DEGREE MURDER WHEN THE JURY WAS FIRST INSTRUCTED AND DID NOT GIVE IT UNTIL REQUESTED BY THE JURY AFTER SEVERAL DAYS OF DELIBERATION.

This contention is without merit.

This matter is presented to this court by way of affidavit of trial counsel. This is outside the record on appeal and cannot be considered by this court on direct appeal. (*People* v. *Merriam,* 66 Cal.2d 390 [58 Cal.Rptr. 1, 426 P.2d 161].) The parties waived recording of the reading

of the instructions. Thus, we are faced only with a clerk's transcript which shows that the challenged instruction was given. Doubt is cast on the contention that it was given belatedly because not only does it appear in its proper chronological place in the instructions, but we also find in the instructions CALJIC No. 8.70 (duty of the jury on the degree of murder), CALJIC No. 8.71 (doubt whether first or second degree murder), and CALJIC No. 8.74 (unanimous agreement on the offense of first or second degree murder or manslaughter). In addition, the subject of second degree murder is found in the general instructions given as to the possible verdicts. All this, plus the presumption (Evid. Code, § 664) that all instructions were read to the jury renders this contention spurious.

The defendant received a fair trial. The court was meticulous in seeing that his rights were protected at all times. He was represented by skilled and capable counsel. The prosecutor took no undue advantage of him. The defendant received due process of law which is more than can be said of the decedent.

Judgment affirmed.

Kerrigan, J., and Kaufman, J., concurred.

A petition for a rehearing was denied May 8, 1974, and appellant's petition for a hearing by the Supreme Court was denied June 13, 1974.