Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/19/2020 09:09 AM CDT

State of Nebraska, appellee, v.
Timothy J. Britt, appellant.
___ N.W.2d ___

Filed March 27, 2020.    No. S-18-557.

1. **Trial: Photographs.** The admission of photographs of a gruesome nature rests largely with the discretion of the trial court, which must determine their relevancy and weigh their probative value against their prejudicial effect.

2. **Trial: Photographs: Appeal and Error.** An appellate court reviews the decision by a trial court to admit photographs of the victims' bodies for abuse of discretion.

3. **Constitutional Law: Witnesses: Appeal and Error.** An appellate court reviews de novo a trial court's determination of the protections afforded by the Confrontation Clause of the Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution and reviews the underlying factual determinations for clear error.

4. **Homicide: Photographs.** Gruesome crimes produce gruesome photographs. However, if the State lays proper foundation, photographs that illustrate or make clear a controverted issue in a homicide case are admissible, even if gruesome.

5. ____: ____. In a homicide prosecution, a court may admit into evidence photographs of a victim for identification, to show the condition of the body or the nature and extent of wounds and injuries to it, and to establish malice or intent.

6. **Photographs: Rules of Evidence.** Neb. Evid R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016), does not require the State to have a separate purpose for every photograph, and it requires a court to prohibit cumulative evidence only if it "substantially" outweighs the probative value of the evidence.

7. **Constitutional Law: Witnesses.** The right of an accused to confront the witnesses against him or her is guaranteed by the Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution.

Appeal from the District Court for Douglas County: KIMBERLY MILLER PANKONIN, Judge. Affirmed.

Michael J. Wilson and Glenn Shapiro, of Schaefer Shapiro, L.L.P., for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

Timothy J. Britt, pro se.

MILLER-LERMAN, CASSEL, STACY, and PAPIK, JJ., and BISHOP and ARTERBURN, Judges.

MILLER-LERMAN, J.

## NATURE OF CASE

Following this court's reversal of his convictions in *State v. Britt*, 293 Neb. 381, 881 N.W.2d 818 (2016), Timothy J. Britt was retried in Douglas County District Court and convicted of three counts of first degree murder, three counts of use of a deadly weapon to commit a felony, and one count of possession of a deadly weapon by a prohibited person. Britt appeals and claims that the district court erred when it admitted crime scene and autopsy photographs over his objection and violated the Confrontation Clause of the Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution when it allowed the State to present its case at trial without the testimony of a separately tried alleged coconspirator, Anthony Davis. We find no merit to Britt's assignments of error and, accordingly, affirm his convictions and sentences.

## STATEMENT OF FACTS

The charges in this case arise from the July 9, 2012, deaths of Miguel E. Avalos, Sr. (Avalos), and two of his sons, Jose Avalos and Miguel E. Avalos, Jr., in their Omaha, Nebraska, home during an apparent attempted robbery. Each of them was shot multiple times, and each died as a result of his wounds.

Avalos' oldest son, Francisco Avalos, was in the home in a downstairs bedroom with his wife and baby at the time the three victims were shot upstairs. He testified at trial that he woke up to the sound of gunshots. He locked the door to the bedroom, called the 911 emergency dispatch service, and while remaining on the telephone, heard more than one person come halfway down the stairs leading to the basement. He testified that a male voice unknown to him said "let's go," and he heard footsteps of multiple people running across the floor upstairs.

Police responded to Avalos' home around 3:45 a.m. and observed signs of forced entry at one of the entrances to the residence. A section of the doorjamb on the door to the north side of the residence was missing, and its strike plate was found lying at the bottom of the basement stairs, along with a wood screw. A second wood screw was found lying on the tile in the entryway near the door.

Inside Avalos' bedroom, police discovered methamphetamine, drug records, drug paraphernalia, over $5,000 in cash, and a defaced .40-caliber semiautomatic pistol. Several .40-caliber bullets were also recovered from various locations inside the residence. Bullets recovered from the victims' bodies were consistent with .22- and .40-caliber firearms.

The State contends that the three victims were killed by Davis and Britt during an attempted robbery. Avalos had been a known drug dealer. A plan to rob him originated with Greg Logemann, a drug dealer who resided in Council Bluffs, Iowa. Logemann testified for the State pursuant to several immunity agreements. Logemann was introduced to Avalos by Logemann's brother-in-law, who was Avalos' coworker. Logemann knew Avalos sold methamphetamine and, in mid-2012, approached Davis, a fellow drug dealer, about robbing Avalos. Logemann had known Davis for 20 years and had discussed robberies with him in the past. Logemann believed Avalos was an easy target and might have "[m]oney and dope." Logemann advised Davis that the best time to rob

Avalos was between 4 and 5 a.m., because Avalos would likely be going to work. Logemann testified that he was not aware of any children living in Avalos' home. Logemann did not intend to participate in the robbery, and he and Davis planned to divide the proceeds among themselves and others who would help execute the robbery.

On the night of July 8, 2012, Charice Jones, the roommate of Davis' friend, Crystal Branch, drove Davis, Logemann, and Branch to the area of 9th and Bancroft Streets where Logemann identified Avalos' home for Davis. A third male accompanied the group on this trip, and he was identified in the testimony as either Britt or another man named "Mike."

Later that night, Branch, Jones, Davis, and Britt returned to Branch's home where they remained for several hours using drugs and drinking alcohol. Britt was sitting on the couch "really quiet." The group remained at the residence until Davis said it was time to go. Davis asked Jones to drive him, Britt, and Branch back to the area of Avalos' home. According to Branch, Britt told Jones where to park down the street from Avalos' home, took possession of Jones' car keys, and told Branch and Jones to get in the back seat. Branch and Jones complied, and Davis and Britt walked north up 9th Street toward Avalos' home. Branch and Jones testified that they assumed the two men were going to buy more drugs.

Branch claimed that about 5 minutes later, Davis returned to the front passenger seat of the vehicle without saying a word. Branch did not see any weapons in Davis' possession. A few minutes after Davis returned, Britt came running back, entered the vehicle, and sat in the driver's seat. According to Branch, Britt wore gloves and a bandanna over his face. Britt drove "[f]ast" and "straight back" to Branch's home.

As soon as Davis, Britt, Branch, and Jones arrived at Branch's home, Davis and Britt left the vehicle and walked to the end of the block to argue about something. After returning, Davis "looked sick" and went to the bathroom, where it "sounded like he was getting sick" according to Branch. Britt sat silently

on the couch in the living room. When Davis emerged from the bathroom, he asked Branch for her address because "[h]e was trying to find a ride." At around 4 a.m., Davis began calling and sending text messages to his ex-girlfriend, Tiaotta Clairday. Branch testified that she spoke on a cell phone with an unknown woman to whom she provided directions to her home for Davis. An "older" gray or silver "Cutlass or Regal" pulled up, and Davis and Britt left together in it.

Clairday testified that she began receiving several messages from Davis around 4:30 a.m. Davis told Clairday in "hushed tones" that he needed her to pick him up. Clairday recalled that Davis sounded agitated and frustrated. When Clairday arrived in a borrowed Buick Regal, Davis entered the front seat. Clairday asked Davis why he had called her to pick him up. Davis stated that Britt needed to come along with them too, because Britt had a gun. Clairday had met Britt once before, but she did not know him and did not want him in her vehicle. She and Davis argued briefly before Britt entered the vehicle. Clairday questioned Britt, and Britt handed his .22-caliber revolver to Clairday.

Clairday stopped at a gas station and then proceeded to the apartment of her friend, Larry Lautenschlager, in Council Bluffs. At the apartment, Davis and Britt waited near the door as Clairday gave the .22-caliber revolver to Lautenschlager and asked him to get rid of it. Clairday also requested a change of clothing for both Davis and Britt, and then she took Davis to the bathroom to talk. Clairday testified that Davis was mumbling, appeared scared, and had apparently soiled himself. Clairday helped Davis change his clothes and noticed that he had blood on his shoe. After Clairday left the bathroom, she walked outside and observed Britt burning a pair of gloves on a grill.

Clairday transported Davis and Britt to Davis' apartment. She accompanied Davis upstairs, while Britt remained downstairs. Davis wanted to leave town, so Clairday helped him pack a bag. She also continued to speak with Davis, who still

appeared scared. They finished packing and went downstairs to load the vehicle.

Clairday, Davis, and Britt then drove to Logemann's apartment. Davis went inside alone. Back in the vehicle, Clairday asked Britt what was wrong with Davis, but Britt did not respond. When Davis returned, Clairday drove to a restaurant in Council Bluffs. Thereafter, she drove to the apartments behind another restaurant and waited in the vehicle while Davis and Britt went inside. Davis returned alone. Clairday testified that after this point, Davis appeared scared and was crying as he related to her why he had called her in the middle of the night and what had happened. Clairday then dropped Davis off at his apartment.

After Branch and Jones observed television news reports about the shootings the morning of July 9, 2012, Branch recognized the area of the crime and became concerned. Davis agreed to meet with Branch and Jones in Council Bluffs. After going to several different addresses given to them by Davis, they met with him later in the day on July 9. When they arrived at the final address, Davis sat in their vehicle and took their cell phones to search them and make sure they were not "trying to set him up." Davis, Branch, and Jones discussed what Branch and Jones saw on the news, and then Davis returned their cell phones. Branch and Jones expressed concern for their safety, and Branch felt that she and her children needed to get out of town. Following this conversation, and without an invitation, Britt began living with Branch and Jones and went everywhere they went. He lived in the basement with Jones for "[p]robably a month or better." The women never called police about their concerns.

A few days after the murders, Clairday drove out to the country near Ashland, Nebraska, where she disposed of several items, including the .22-caliber revolver. She asked Lautenschlager to drive her to a lake north of Ashland. Clairday exited the vehicle alone and, after waiting for Lautenschlager to drive out of sight, threw the revolver into a culvert. The

revolver was wrapped up in a tank top secured by a headband. A crime laboratory technician testified about her understanding to the effect that following Clairday's arrest, she led law enforcement to the hiding place where officers recovered the revolver, which was rusty and dirty and had a grip that was wrapped in black electrical tape. Comparisons of the revolver to the .22-caliber bullets recovered from the victims were inconclusive.

Logemann also testified about his observations of Davis and Britt after the murders. At about 4:30 or 5 a.m. on the day of the shootings, he received either a call or text from Davis in which Davis "told [Logemann] he couldn't do it because his girlfriend was tripping out on him." Later that same morning, an Omaha police officer contacted Logemann and asked him what he might know about a robbery at 9th and Bancroft Streets. Logemann met with police and lied to cover for himself during their initial questioning. After his initial contact with police, Logemann met with Davis in person at a location between their homes; Davis' girlfriend drove Davis to Logemann, picked Logemann up, and then Logemann and Davis discussed the robbery and what had happened.

Later that night, Britt accompanied Davis on an unexpected visit to Logemann's apartment. Davis requested to borrow Logemann's laptop computer, and Logemann loaned him a laptop computer. While in Logemann's apartment, Britt asked Logemann about a picture of his children that was hanging on his refrigerator. The questions made Logemann "uncomfortable," because he feared that Britt "might try to do something" to his children. Following this encounter with Davis and Britt, Logemann told Omaha police on July 20 and 24 and August 2 or 3, 2012, what he knew about Davis, Britt, and the shootings at 9th and Bancroft Streets.

The coroner who performed autopsies on the three victims determined that each died due to gunshot wounds to the head. Several crime scene and autopsy photographs were introduced by the State and received in evidence over Britt's objection.

*Procedural History.*

The State charged Britt with three counts of first degree murder (Class IA felony), Neb. Rev. Stat. § 28-303(1) and (2) (Reissue 2008); three counts of use of a deadly weapon (gun) to commit a felony (Class IC felony), Neb. Rev. Stat. § 28-1205(1)(a) and (c) (Reissue 2016); and one count of possession of a deadly weapon (gun) by a prohibited person (Class ID felony), Neb. Rev. Stat. § 28-1206(1)(a) and (3)(b) (Reissue 2016). The State also charged that Britt met the definition of a "habitual criminal" as described in Neb. Rev. Stat. § 29-2221 (Reissue 2016).

This case is related to *State v. Davis*, 290 Neb. 826, 862 N.W.2d 731 (2015). Davis and Britt were allegedly coconspirators who were tried separately for their involvement in the Avalos murders. Both defendants were convicted by their respective juries. However, on April 22, 2016, we filed our opinion in *State v. Britt*, 293 Neb. 381, 881 N.W.2d 818 (2016), in which we found that the district court had reversibly erred when it admitted the hearsay statements of Davis which implicated Britt in the murders. Following our mandate, Britt was retried to a jury and found guilty on all counts as charged, as follows: (1) guilty as to count I, first degree murder, a Class IA felony; (2) guilty as to count II, use of a deadly weapon to commit a felony, a Class IC felony; (3) guilty as to count III, first degree murder, a Class IA felony; (4) guilty as to count IV, use of a deadly weapon to commit a felony, a Class IC felony; (5) guilty as to count V, first degree murder, a Class IA felony; (6) guilty as to count VI, use of a deadly weapon to commit a felony, a Class IC felony; (7) guilty as to count VII, possession of a deadly weapon by a prohibited person, a Class ID felony.

*Sentencing.*

Britt's sentencing hearing was conducted on May 3, 2018, at which time the district court received evidence relative to enhancement. The district court found that Britt met the definition of a "habitual criminal" within the meaning of § 29-2221.

With respect to each of the three first degree murder convictions, Britt received a sentence of life imprisonment. For each of the three use of a deadly weapon (gun) to commit a felony convictions, Britt received a sentence of 40 to 45 years' imprisonment. As to possession of a deadly weapon (gun) by a prohibited person, Britt received a sentence of 40 to 45 years' imprisonment. The sentences for all convictions were ordered to be served consecutively to one another. Britt received 2,108 days' credit for time served toward his sentence for possession of a deadly weapon by a prohibited person.

Britt appeals.

## ASSIGNMENTS OF ERROR

On appeal, Britt claims, summarized and restated, that the district court (1) erred when it admitted crime scene and autopsy photographs over his objection and (2) violated his right of confrontation by allowing the State to proceed at trial without calling Davis to testify.

## STANDARDS OF REVIEW

[1,2] The admission of photographs of a gruesome nature rests largely with the discretion of the trial court, which must determine their relevancy and weigh their probative value against their prejudicial effect. *State v. Dubray*, 289 Neb. 208, 854 N.W.2d 584 (2014). An appellate court reviews the decision by a trial court to admit photographs of the victims' bodies for abuse of discretion. See *id*.

[3] An appellate court reviews de novo a trial court's determination of the protections afforded by the Confrontation Clause of the Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution and reviews the underlying factual determinations for clear error. *State v. Smith*, 302 Neb. 154, 922 N.W.2d 444 (2019).

## ANALYSIS

*Crime Scene and Autopsy Photographs.*

Britt claims generally that the district court erred when, over his objection, it admitted numerous crime scene and autopsy

photographs generally showing the bodies of the murder victims. He specifically claims that such admission violated Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016). Rule 403 provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." We find no merit to this assignment of error.

Britt identifies 13 of the admitted photographs and argues their probative value was outweighed by their prejudicial nature. He focuses on their gruesome nature and also contends that many of the photographs are duplicative.

[4] We have often observed that gruesome crimes produce gruesome photographs. *State v. Stelly*, 304 Neb. 33, 932 N.W.2d 857 (2019). However, if the State lays proper foundation, photographs that illustrate or make clear a controverted issue in a homicide case are admissible, even if gruesome. *Id.*; *State v. Dubray, supra*.

With respect to homicide cases, other authorities have noted, and we agree, that

> murder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant; and . . . many attorneys tend to underestimate the stability of the jury. A juror is not some kind of a dithering nincompoop, brought in from never-never land and exposed to the harsh realities of life for the first time in the jury box. There is nothing magic about being a member of the bench or bar which makes these individuals capable of dispassionately evaluating gruesome testimony which, it is often contended, will throw jurors into a paroxysm of hysteria. Jurors are our peers, often as well educated, as well balanced, as stable, as experienced in the realities of life as the holders of law degrees. The average juror is well able to stomach the unpleasantness of exposure to the facts of a murder without being unduly influenced.

*People v. Long*, 38 Cal. App. 3d 680, 689, 113 Cal. Rptr. 530, 536-37 (1974), *disapproved on other grounds, People v. Ray*, 14 Cal. 3d 20, 533 P.2d 1017 (1975).

[5] The State is allowed to present a coherent picture of the facts of the crimes charged, and it may generally choose its evidence in so doing. *State v. Dubray*, 289 Neb. 208, 854 N.W.2d 584 (2014). In a homicide prosecution, a court may admit into evidence photographs of a victim for identification, to show the condition of the body or the nature and extent of wounds and injuries to it, and to establish malice or intent. *Id.*

With respect to the crime scene and autopsy photographs challenged on appeal, the State has proffered a variety of purposes for their probative value. We agree with the State that the photographs show the positions of the bodies and wounds from several positions and were for the purpose of suggesting multiple shooters were present, corroborating testimony from Francisco Avalos that he heard footsteps of more than one shooter and countering Britt's suggestion that he was not involved in the shootings. The photographs also show the victims' wounds and spent shell casings. The State was able to use these photographs to connect the crimes to a .22-caliber revolver owned by Britt and featured in the alleged coverup of the crimes. The autopsy photographs document the manner and cause of the victims' deaths.

[6] Although several photographs depict similar scenes from different angles as compared to other photographs in evidence, the general rule is that when a court admits photographs for a proper purpose, additional photographs of the same type are not unfairly prejudicial. *State v. Jenkins*, 294 Neb. 684, 884 N.W.2d 429 (2016). Rule 403 does not require the State to have a separate purpose for every photograph, and it requires a court to prohibit cumulative evidence only if it "substantially" outweighs the probative value of the evidence. *State v. Dubray, supra*. We determine that the district court admitted the photographs for a proper purpose and did not abuse its discretion

when it concluded that the photographs of the crime scene and autopsy were not unfairly prejudicial.

*Right to Confront Davis.*

[7] Britt, acting pro se, also claims that the district "court violated the confrontation clause when it did not call . . . Davis to the stand." Pro se supplemental brief for appellant at 12. The right of an accused to confront the witnesses against him or her is guaranteed by the Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution. Britt contends, restated, that his right of confrontation was violated because Davis, the alleged coconspirator, was not called to testify about who he was with during the timeframe during which the murders were committed. Britt contends that this testimony was necessary to protect his rights because the State's evidence was limited to individuals who did not claim to have directly witnessed the murders.

Britt did not present a confrontation claim to the district court. We note that regardless of whether this claim was preserved, Britt has directed us to no authority to the effect that the district court had an independent obligation to call a witness or require the State to call a witness. Davis did not testify at trial, and Britt had the opportunity to cross-examine the several witnesses against him at trial. We have not been directed to, and we are unaware of, a separate proposition of law that would apply in this case to support Britt's contention that the trial court should have independently required Davis to testify. And to the contrary, we have previously concluded that hearsay testimony from Davis was not admissible. *State v. Britt*, 293 Neb. 381, 881 N.W.2d 818 (2016).

As noted above, a major component of Britt's argument on appeal is that the evidence against him was merely circumstantial and that this presented a confrontation issue without Davis' testimony. To the extent that Britt contends the evidence was insufficient to support his convictions or, in the absence of Davis' testimony, his Sixth Amendment rights were violated, we disagree. Testimony collectively showed that at least two

people were inside Avalos' home at the time of the murders; Britt was the only person with Davis immediately before and after the murders; Britt possessed a .22-caliber revolver, which was consistent with one of the two types of firearms used to commit the murders; and Britt was seen performing acts of concealment, including burning a pair of gloves he was wearing after the murders. The evidence presented by the State from other witnesses' personal observations, without direct testimony from Davis, was that Britt was Davis' accomplice. This assignment of error is without merit.

## CONCLUSION

We determine that the admission of photographs of the crime scene and autopsy were not unfairly prejudicial and that the district court did not have an independent duty to call coconspirator Davis to testify. Accordingly, we affirm Britt's convictions and sentences for three counts of first degree murder, three counts of use of a deadly weapon to commit a felony, and one count of possession of a deadly weapon by a prohibited person.

Affirmed.

Heavican, C.J., and Freudenberg, J., not participating.