Filed 12/9/15  P. v. Vasquez CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>DENNIS VASQUEZ,<br><br>　　　　　Defendant and Appellant. | B260478<br><br>(Los Angeles County<br>　Super. Ct. No. SA075533) |

APPEAL from the judgment of the Superior Court of Los Angeles County.  Elden Fox, Judge.  Affirmed as modified.

Derek K. Kowata, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Joseph P. Lee and Jaime L. Fuster, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Defendant Dennis Vasquez was charged by information in 2011 with one count of first degree murder (Pen. Code, § 187, subd. (a)) for the 1975 killing of 80-year-old Alice Lewis. The case was tried on a felony murder theory, that the killing occurred during the course of a burglary or rape. At trial, defendant testified that during the time the crime occurred, he was abusing substances such as Quaaludes and alcohol, which caused him to black out, and that he had no memory of committing the crime. The jury found defendant guilty of first degree felony murder.

On appeal, defendant contends the trial court had a sua sponte duty to instruct the jury on the lesser included offense of involuntary manslaughter, based on diminished capacity and voluntary intoxication, theories that were viable when he committed the offense. Defendant also contends he received ineffective assistance of counsel, as his attorney did not request an involuntary manslaughter instruction, and conceded defendant was guilty of second degree murder. Defendant also contends, and respondent concedes, that various fines must be stricken. We affirm the judgment of conviction and strike the unauthorized fines.

**FACTS**

In 1975, Margaret Rogers was a Christian Science nurse who occasionally assisted the elderly Alice Lewis in her home in Mar Vista, where she lived alone. On the morning of December 18, 1975, when Ms. Rogers arrived at Ms. Lewis's home, the front door was open. Inside, the home was "very messed up," with items strewn all over the floor. The glass on the back door was broken. Ms. Rogers found Ms. Lewis on her bedroom floor; she had no pulse and her body was lifeless and rigid. Her nightgown was pulled up over her waist, exposing her lower body. Ms. Rogers did not move the body, or anything else in the home. She went to a neighbor's house and called police.

Los Angeles Police Officers Robert Smith and John Arminio were the first to arrive at the scene that morning. Officer Smith saw Ms. Lewis lying on a bedroom floor, with her hands tied over her head by a white cord. She had blood coming out of her mouth. The officers secured the crime scene until detectives arrived.

Los Angeles Police Detective Ronald Ravens arrived at the scene at 10:30 a.m. From outside the house, he saw the door to the circuit breaker panel was open, and the

2

circuit breaker controlling electricity for the house was turned off. The glass and screen on the back door were broken, and the door had been forced open. Also, the exterior clothesline, made of a white plastic cord, had been cut.

Once inside the home, Detective Ravens noticed fresh bloodstains on the couch in the front room, as well as on a pillow there. Things in the house had been disturbed, consistent with a burglary. The bedroom dresser was open, and items were on the floor. Ms. Lewis's body was in the bedroom. There were injuries to her face, and bloodstains around her mouth. Her hands were tied with a piece of white clothesline. There was another piece of clothesline on the floor next to the body. Clocks inside the home displayed various times between 7:00 and 8:00, causing police to conclude that the power had been turned off sometime between 7:00 and 8:00 p.m. on December 17.

Darnell Carter, a latent fingerprint examiner, and his team lifted multiple prints from Ms. Lewis's house. In the bedroom they obtained prints from the bedroom closet, and the cabinet above the bedroom closet. Prints were also obtained from the door frame for a white china closet and from the glass top of the den's desk. They also obtained prints from the doorknob of the outside patio door, the exterior door frame, and the frame of the electric meter box.

Deputy Medical Examiner with the Los Angeles County Coroner's Office, Dr. Paul Gliniecki, testified that he reviewed the autopsy report for Ms. Lewis, and other documents related to the report. The autopsy had been performed by Dr. Joseph Choi on December 19, 1975. According to the report, Ms. Lewis had facial abrasions, contusions on the back of her head, and bite marks inside her lower lip. The contusions were caused by blunt force injury. The bite marks could have been caused by pressure being applied to her lower lip, pushing it against her teeth. She also had petechial hemorrhages in her eyes and injuries to her neck which were consistent with strangulation or smothering. Ms. Lewis also had bruising to her wrists and arms, which was consistent with her wrists being bound while she was still alive. Dr. Gliniecki opined that the cause of death was manual strangulation. It could take seven or eight minutes for the heart to stop beating once a person is deprived of oxygen. Dr. Gliniecki also opined that Ms. Lewis had died 12 to 24 hours before 10:30 a.m. on December 18, 1975.

Ms. Lewis also had grayish-white fluid inside her vagina. The fluid was submitted for testing, and a microscopic examination of it revealed that it contained high levels of spermatozoa, consistent with the sperm having been deposited within a 24-hour period. In order for the sperm to have been deposited within Ms. Lewis's vagina, her vagina would have to have been penetrated. The swabs and slides of the sperm were stored at the Coroner's office.

Almost 30 years later, Detective Timothy Marcia was a member of the Los Angeles Police Department's Cold Case Unit when the unit decided to investigate Ms. Lewis's murder. In 2004, two vaginal slides were submitted for DNA testing. The test yielded one male profile. When the test results were received in 2004, the Los Angeles Police Department did not have a match for this profile.

In 2009, Detective Marcia received a lead that the DNA profile belonged to defendant. Detective Marcia investigated where defendant had been in 1975. He found a 1976 yearbook from Venice High School, where defendant had been a senior. The school was located less than a mile from the murder scene. In September 2009, Officer Marcia obtained an oral swab from defendant. Defendant's DNA, and fingerprints, were sent to a lab for a comparative analysis. It was determined that defendant's fingerprints matched those found on the bedroom closet, bedroom cabinet, the back door, the china closet, the meter box, desk, and patio door at Ms. Lewis's home  The DNA profile taken from defendant was also a match.

Defendant testified. Defendant only had "some" recollection of the incidents described during the trial. He was 15 or 16 years old in December 1975. At that time, he "started experimenting with alcohol and drugs." He mainly experimented with alcohol and marijuana, but also used Quaaludes and cocaine. Defendant did drugs with his friend, Kevin Shanahan, who attended school with defendant and also belonged to the same baseball league.

"At that time" defendant would "black out" "quite a bit" when he drank alcohol and used Quaaludes. Defendant could not remember how many times he blacked out, but believed it happened "quite a few times." There were times when he knew he had been doing things, but could not recall what he had done. Quaaludes and alcohol would make

4

him tired and lethargic, and impotent. He admitted that when he was interviewed by detectives about the murder, he did not mention blacking out or taking Quaaludes.

Defendant did not know Ms. Lewis, but he was familiar with her house. He lived one street over from Ms. Lewis, and had friends, including Shanahan, who lived on Ms. Lewis's street. Defendant recalled that Shanahan told him he knew "where someone lived by themselves and that he wanted to go and burglarize the place."

Defendant did not recall breaking into or entering Ms. Lewis's house, tying her up, or having any sexual contact with her. However, defendant did not deny raping Ms. Lewis. He did deny that he would have had sex with a dead body. Defendant emphatically denied being in Ms. Lewis's home and murdering her.

## DISCUSSION

### 1. Instruction on Lesser Included Offense

Defendant contends the trial court erroneously failed to sua sponte instruct the jury on the lesser included offense of involuntary manslaughter based on diminished capacity and voluntary intoxication.

The jury was instructed with the elements of rape, burglary, and felony murder. The jury was also instructed that in the event they were not convinced beyond a reasonable doubt that defendant had committed first degree murder, that the jury must find that it was murder in the second degree. The trial court also instructed the jury that it could consider defendant's voluntary intoxication in the context of whether it prevented him from forming the specific intent to commit burglary.

Although the defense of diminished capacity has been abolished, it was an available defense at the time defendant's crime was committed, if supported by the facts. (See *People v. Pensinger* (1991) 52 Cal.3d 1210, 1240-1241 [the Legislature abolished the defense of diminished capacity in 1981, but the statute does not apply retroactivity].)

Generally, the trial court must instruct the jury on all lesser included offenses if there is substantial evidence defendant may be guilty of the lesser offense, but not the charged offense. No instruction on a lesser offense is required if the evidence shows the defendant, if guilty, is only guilty as charged. (*People v. Taylor* (2010) 48 Cal.4th 574, 623.)

5

It is well settled that involuntary manslaughter is a lesser included offense of murder.[1] (*People v. Cook* (2006) 39 Cal.4th 566, 596.) Involuntary manslaughter is a killing without malice which occurs "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (Pen. Code, § 192, subd. (b).) The now-abolished defense of diminished capacity caused by involuntary intoxication may negate a finding of malice. Under former law, "If an individual by reason of diminished capacity caused by mental illness, mental defect *or* unconsciousness resulting from voluntary intoxication does not have the mental capacity to premeditate, to deliberate, to harbor malice aforethought or to form an intent to kill, he can be guilty only of the offense of involuntary manslaughter. Once that mental state has been attained, it matters not whether it is the result of mental illness, mental defect or unconsciousness resulting from voluntary intoxication." (*People v. Long* (1974) 38 Cal.App.3d 680, 685-686.) Unconsciousness does not mean the defendant was "still and unresponsive." (*People v. Ochoa* (1998) 19 Cal.4th 353, 423.) Instead, it means that he was not aware of the acts he was committing. (*Id.* at pp. 423-424.)

Defendant was tried and convicted on a felony murder theory, that Ms. Lewis was killed either during the course of a burglary or rape.[2] "All murder which is . . . committed in the perpetration of, or attempt to perpetrate . . . rape [or] burglary . . . is murder of the first degree." (Pen. Code, § 189.) "The mental state required [for felony murder] is simply the specific intent to commit the underlying felony; neither intent to

---

[1]    Both defendant and respondent have assumed, without analysis, that involuntary manslaughter is a lesser included offense of *felony* murder. We note that there is some debate about whether a trial court has a duty to instruct on other theories of homicide as lesser included offenses of *felony* murder. (See *People v. Anderson* (2006) 141 Cal.App.4th 430, 442-446.) Here, even though the People proceeded at trial on a theory of felony murder, the accusatory pleading alleged first degree malice murder, and therefore, under the accusatory pleading test for determining whether a crime is a lesser included offense, the trial court was required to instruct on involuntary manslaughter if such a theory was supported by substantial evidence. (*Id*. at pp. 445-446.)

[2]    The jury was not asked to specify which felony its verdict was based on.

6

kill, deliberation, premeditation, nor malice aforethought is needed." (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1140-1141.) Specific intent to commit the underlying felony is required even if the underlying felony is a general intent crime. (See *People v. Jones* (2003) 29 Cal.4th 1229, 1256-1257.) Therefore, the court would have had a duty to instruct on diminished capacity if there had been substantial evidence that defendant was unable to form the intent to commit burglary or rape as a result of voluntary intoxication.

However, we find no substantial evidence supported an involuntary manslaughter instruction. Defendant testified that he did not recall killing, burglarizing, or raping Ms. Lewis. His explanation for his lack of recollection was that he was generally doing drugs and drinking during that period of time, and because of the passage of nearly 40 years since the killing. Defendant had no recollection of using drugs on the day in question. This testimony was not substantial evidence warranting instruction on the defense of diminished capacity.

The evidence at trial showed that defendant methodically executed a burglary and rape. Defendant admitted his friend, Kevin Shanahan, told him before the crime was committed there was someone on Ms. Lewis's street who lived alone and was a target for burglary. Defendant's fingerprints were found on the circuit breaker box outside the house, at various points of entry, and on furniture where valuables would be kept. He turned off the circuit breaker so there was no electricity, to give himself the cover of darkness. He cut clothesline from outside to immobilize Ms. Lewis. He bound Ms. Lewis's hands, but not her feet; her gown was over her waist and defendant's semen was found inside of her, notwithstanding defendant's testimony that alcohol and Quaaludes rendered him impotent. In short, absolutely nothing about the crime indicated that it was committed in an "unconscious" state. If any crime was committed, it was the crime of felony murder. (See, e.g., *People v. Ochoa*, *supra*, 19 Cal.4th at p. 424.)

Moreover, there is no possibility of prejudice.**3**  As discussed above, the evidence that defendant killed Ms. Lewis in the course of a burglary and rape was overwhelming. Moreover, the jury was instructed that it could consider the effect of defendant's voluntary intoxication to form the specific intent to commit burglary, and was also instructed that if the jury was not satisfied that the killing was first degree felony murder, that it must convict defendant of murder in the second degree.  Clearly, the jury was satisfied that defendant committed felony murder.

## 2.    Ineffective Assistance of Counsel

Defendant claims he received ineffective assistance of counsel because his attorney did not request an involuntary manslaughter instruction based on diminished capacity and voluntary intoxication, and because counsel conceded during closing argument that defendant committed second degree murder.  In order to demonstrate ineffective assistance of counsel, a defendant must show that counsel's performance fell below an objective standard of reasonableness, *and* that he was prejudiced by counsel's performance. (*People v. Mitchell* (2008) 164 Cal.App.4th 442, 467.) "It is not sufficient to allege merely that the attorney's tactics were poor, or that the case might have been handled more effectively.  [Citations.]  [¶]  Rather, the defendant must affirmatively show that the omissions of defense counsel involved a critical issue, and that the omissions cannot be explained on the basis of any knowledgeable choice of tactics." (*People v. Floyd* (1970) 1 Cal.3d 694, 709, disapproved on other grounds by *People v. Wheeler* (1978) 22 Cal.3d 258, 287, fn. 36.)

As discussed, *ante*, it is clear that defendant was not prejudiced by the failure to give an involuntary manslaughter instruction.  Therefore, this defeats his claim for ineffective assistance of counsel on this basis.

---

**3**      Defendant seeks to elevate his claim of error to a due process violation, contending it interfered with his right to have the jury consider his theory of the case.  We are not persuaded.  It is well settled that the *Watson* harmless error test applies to claims such as defendant's. (*People v. Breverman* (1998) 19 Cal.4th 142, 178, citing *People v. Watson* (1956) 46 Cal.2d 818, 836 ["it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"].)

During closing argument, defendant's attorney argued that defendant was guilty of second degree murder, as he had "black[ed] out" and could not form the requisite intent for burglary, and because he did not rape Ms. Lewis, as there were no injuries to her vagina, indicating he had sex with her after she was dead. This does not constitute ineffective assistance of counsel. Counsel clearly made the tactical decision to downplay defendant's culpability in the face of the overwhelming evidence of first degree murder. (See *People v. Welch* (1999) 20 Cal.4th 701, 754.)

**3. Fines**

Defendant contends the imposition of a $5,000 restitution fine, a $5,000 parole revocation fine, and a $10 crime prevention fine were improper and must be stricken. Specifically, defendant contends the statutes authorizing the restitution and parole revocation fines did not exist at the time of his crime, and that he did not commit a crime enumerated in the crime prevention statute. (See Stats. 1995, ch. 313, § 6; Stats. 1983, ch. 1092, §§ 426-427; see, e.g., *People v. Callejas* (2000) 85 Cal.App.4th 667, 678 ["applying section 1202.45 to [a defendant], whose underlying crime preceded the enactment of that statute, would violate ex post facto principles"]; see also Pen. Code, § 1202.5.) Respondent concedes the errors. Accordingly, these fines must be stricken.

**DISPOSITION**

The judgment is affirmed as modified. The superior court is directed to strike the parole revocation, restitution, and crime prevention fines, prepare an amended abstract of judgment, and transmit a copy of the same to the Department of Corrections. In all other respects, the judgment is affirmed.

GRIMES, J.

WE CONCUR:

BIGELOW, P. J.

FLIER, J.

9