Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/10/2024 06:08 PM CDT

State of Nebraska, appellee, v.
Bailey M. Boswell, appellant.

___ N.W.3d ___

Filed May 10, 2024.    No. S-21-980.

1. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by those rules and judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

2. **Rules of Evidence: Appeal and Error.** When judicial discretion is not a factor, whether the underlying facts satisfy the legal rules governing the admissibility of a proponent's evidence is a question of law, subject to de novo review.

3. **Rules of Evidence: Judgments: Words and Phrases: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

4. **Rules of Evidence: Appeal and Error.** An appellate court will review for abuse of discretion a trial court's evidentiary rulings on relevance, whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice, and the sufficiency of a party's foundation for admitting evidence.

5. **Trial: Photographs.** The admission of photographs of a gruesome nature rests largely with the discretion of the trial court, which must determine their relevancy and weigh their probative value against their prejudicial effect.

6. **Trial: Photographs: Appeal and Error.** An appellate court reviews the decision by a trial court to admit photographs of the victims' bodies for abuse of discretion.

7. **Rules of Evidence: Other Acts.** An appellate court will review for abuse of discretion a trial court's evidentiary rulings on the admissibility of a defendant's other crimes or bad acts under Neb. Rev. Stat. § 27-404(2) (Reissue 2016), or under the inextricably intertwined exception to the rule.

8. **Rules of Evidence: Hearsay: Appeal and Error.** Hearsay is not admissible except as provided by the Nebraska Evidence Rules. Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination to admit evidence over a hearsay objection or exclude evidence on hearsay grounds.

9. **Appeal and Error.** In a de novo review, an appellate court reaches a conclusion independent of the trial court.

10. **Evidence: Proof: Words and Phrases.** The bar for establishing evidentiary relevance is not a high one; it requires only that the probative value of the evidence be something more than nothing. Evidence is relevant if it tends in any degree to alter the probability of a material fact.

11. **Trial: Evidence.** A trial court exercises its discretion in determining whether evidence is relevant and whether its probative value is outweighed by its prejudicial effect.

12. **Evidence: Words and Phrases.** The probative value of evidence involves a measurement of the degree to which the evidence persuades the trier of fact that the particular fact exists and the distance of the fact from the ultimate issue of the case. Unfair prejudice means an undue tendency to suggest a decision based on an improper basis.

13. **Rules of Evidence.** The fact that evidence is prejudicial is not enough to require exclusion under Neb. Rev. Stat. § 27-403 (Reissue 2016), because most, if not all, of the evidence a party offers is calculated to be prejudicial to the opposing party; it is only the evidence which has a tendency to suggest a decision on an improper basis that is considered unfairly prejudicial under § 27-403.

14. **Trial: Photographs.** When several photographs depict similar scenes from different angles as compared to other photographs in evidence, the general rule is that when a court admits photographs for a proper purpose, additional photographs of the same type are not unfairly prejudicial.

15. **Photographs: Rules of Evidence.** Neb. Rev. Stat. § 27-403 (Reissue 2016) does not require the State to have a separate purpose for every photograph, and it requires a court to prohibit cumulative evidence only if its probative value is "substantially outweighed" by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

16. **Homicide: Photographs.** In a homicide prosecution, a court may admit into evidence photographs of a victim for identification, to show the condition of the body or the nature and extent of wounds and injuries to it, and to establish an element of the crime.

17. **Homicide: Photographs: Juries: Proof.** In a first degree murder case, photographs can also provide visual proof from which a jury could reasonably infer that the homicide was committed purposely and with deliberate and premeditated malice.

18. **Homicide: Photographs.** When the State lays proper foundation, photographs that illustrate or make clear a controverted issue in a homicide case are admissible, even if gruesome.

19. **Trial: Photographs.** The gruesome nature of photographs alone will not keep them from the trier of fact, so long as the probative value is not outweighed by the prejudicial effect.

20. **Photographs: Rules of Evidence.** When considering whether photographs are needlessly cumulative under Neb. Rev. Stat. § 27-403 (Reissue 2016), the number of photographs, in and of itself, is not dispositive; rather, all the circumstances of each case must be considered in determining whether the admission in evidence of a significant number of photographs was so prejudicial that it constitutes reversible error.

21. **Rules of Evidence.** Evidence that is admissible under Neb. Rev. Stat. § 27-404(2) (Reissue 2016) may nevertheless be excluded under Neb. Rev. Stat. § 27-403 (Reissue 2016) if its probative value is substantially outweighed by the danger of unfair prejudice.

22. **Rules of Evidence: Other Acts: Appeal and Error.** An appellate court's analysis under Neb. Rev. Stat. § 27-404(2) (Reissue 2016) generally considers (1) whether the evidence was relevant for some purpose other than to prove the character of a person to show that he or she acted in conformity therewith; (2) whether the probative value of the evidence is substantially outweighed by its potential for unfair prejudice; and (3) whether the trial court, if requested, instructed the jury to consider the evidence only for the limited purpose for which it was admitted.

23. **Criminal Law: Words and Phrases.** Motive is that which leads or tempts the mind to indulge in a criminal act.

24. **Criminal Law: Intent: Proof.** Motive, even when not an element of the charged crime, is nevertheless relevant to the State's proof of the intent element of the crime.

25. **Criminal Law: Rules of Evidence.** Motive qualifies as a legitimate noncharacter theory under Neb. Rev. Stat. § 27-404(2) (Reissue 2016) because although character carries a connotation of an enduring general propensity, a motive is a situationally specific emotion.

26. **Intent: Words and Phrases.** Intent is generally defined as the state of mind accompanying an act.
27. **Conspiracy: Hearsay: Proof.** A statement is excluded from the definition of hearsay under the coconspirator exception if the State shows that (1) a conspiracy existed, (2) the declarant was a member of the conspiracy, (3) the party against whom the assertion is offered was a member of the conspiracy, (4) the assertion was made during the course of the conspiracy, and (5) the assertion was made in furtherance of the conspiracy.
28. \_\_\_\_: \_\_\_\_: \_\_\_\_. Before a trier of fact may consider testimony under the coconspirator exception to the hearsay rule, a prima facie case establishing the existence of a conspiracy must be shown by independent evidence.

Appeal from the District Court for Saline County: Vicky L. Johnson, Judge. Affirmed.

Todd W. Lancaster, of Nebraska Commission on Public Advocacy, for appellant.

Douglas J. Peterson, Attorney General, and Stacy M. Foust for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Stacy, J.

After the dismembered remains of 24-year-old Sydney Loofe were discovered, Bailey M. Boswell and Aubrey C. Trail were charged, in separate criminal cases, with premeditated first degree murder, conspiracy to commit first degree murder, and improper disposal of human skeletal remains. Trail's case was tried in 2019, and the jury found him guilty on all charges. His convictions and sentences were affirmed on direct appeal.[1]

This appeal involves Boswell, whose case was tried in 2020. The jury found Boswell guilty on all charges. A three-judge panel sentenced her to life imprisonment on the first

---

[1] *State v. Trail*, 312 Neb. 843, 981 N.W.2d 269 (2022).

degree murder conviction, and the presiding trial judge imposed consecutive terms of imprisonment on the remaining convictions. In this direct appeal, Boswell assigns error to several evidentiary rulings made during the guilt phase of trial. Finding no error in the district court's evidentiary rulings, we affirm Boswell's convictions and sentences.

## I. BACKGROUND

On November 16, 2017, Loofe was reported missing after she failed to show up for work at a hardware store in Lincoln, Nebraska. Loofe's family and friends knew that a few days earlier, on November 14, she had gone on a first date with a female named "Audrey," who she met through an online dating application (dating app). They also knew that Loofe had a second date planned with "Audrey" for the evening of November 15. After Loofe was reported missing on November 16, one of her friends located the online profile for "Audrey" and provided it to police. Police investigators discovered that "Audrey" was actually Boswell, and they eventually learned that Boswell and Trail lived together in a basement apartment in Wilber, Nebraska.

Investigators also obtained cell site location data for two cell phones associated with Boswell and one associated with Trail. That data, along with other evidence gathered during the investigation, showed the following coordinated activity by Boswell and Trail during the days immediately before and after Loofe's disappearance.

### 1. Cell Phone Activity on November 14 and 15, 2017

On the afternoon of November 14, 2017, Loofe texted Boswell her apartment address in preparation for their first date that evening. Within minutes, Boswell phoned a hotel close to Loofe's apartment, after which Boswell and Trail traveled to, and checked into, that hotel. At 5:35 p.m., Boswell left the hotel without Trail and drove to Loofe's apartment. Boswell picked up Loofe, and they drove around Lincoln for

almost 2 hours. Boswell returned Loofe to her apartment at approximately 7:15 p.m., and Loofe remained there until she left for work the following morning. Boswell phoned Trail at 7:22 p.m., and then returned to the hotel where she and Trail spent the night.

Boswell and Loofe planned a second date for the evening of November 15, 2017. On the morning of November 15, Boswell and Trail traveled to the vicinity of Loofe's apartment and then followed the same route that Loofe took to her job. Shortly after Loofe began her work shift, Trail was observed on the hardware store's security camera watching Loofe, after which Trail phoned Boswell, who was waiting in the store parking lot. Throughout the day, Boswell and Trail went to multiple stores in Lincoln and Wilber and purchased items, including plastic dropcloths, a hacksaw, hacksaw blades, tin snips, drywall blades, a utility knife, rope, chemical drain cleaner, bleach, plastic trash bags, duct tape, and four roasting pans.

Shortly before 7 p.m. on November 15, 2017, Boswell arrived at Loofe's apartment, and the two traveled together to Boswell's apartment in Wilber. At approximately 8:08 p.m., Boswell and Loofe arrived at the apartment. The last time Loofe's cell phone communicated with any cell tower was at 8:32 p.m.

## 2. Evidence Linking Loofe's Disappearance and Death to Boswell and Trail

The following morning, November 16, 2017, Boswell purchased more bleach, plastic trash bags, and chemical drain cleaner in Wilber. Police telephoned Boswell on November 17, and she admitted going on a date with Loofe on November 15th but insisted she had dropped Loofe off at a friend's home in Lincoln after the date.

On November 18, 2017, police conducted a welfare check at the Wilber apartment shared by Boswell and Trail. No one was in the basement apartment, but police noticed a strong

smell of bleach. The upstairs residents reported that an overwhelming bleach smell began on the night of November 15.

Using cell site location data and mapping software, investigators were able to determine that on the afternoon of November 16, 2017, the cell phones associated with Boswell and Trail traveled the same route along county roads west of Wilber. For approximately 3½ hours that afternoon, those cell phones were either stationary or slowly moving along that route.

In December 2017, investigators searched the county roads and ditches along the route where Boswell's and Trail's cell phones had traveled on November 16. They discovered a partially torn plastic trash bag that contained severed human body parts, including a severed arm with a distinct tattoo that matched a known tattoo of Loofe. In subsequent searches of ditches and fields in the area, investigators discovered additional disposal sites, and eventually, they recovered a total of 13 body segments. All of the recovered body segments were found in or near plastic trash bags, and several of the bags were torn or ripped open when discovered. All of the body segments were photographed as they were discovered. A total of 87 photographs were taken documenting the recovery process, and some of those photographs were admitted into evidence at trial over Boswell's objection.

In all, 17 different disposal sites were discovered by investigators. Additional items of evidence were recovered near the body segments, including (1) plastic tarps with what appeared to be blood and body fluids; (2) pieces of a sauna suit with the crotch cut out; (3) a sex toy; (4) latex gloves; (5) a flat bedsheet; (6) star-patterned pajama pants; (7) an extension cord; (8) a large green shirt with apparent bleach stains on it; (9) torn pieces of denim clothing; (10) a towel; (11) cut-up pieces of Loofe's driver's license and credit card; (12) broken pieces of Loofe's cell phone; (13) Loofe's jacket, bra, and shirt; and (14) Loofe's car keys.

When investigators searched the Wilber apartment shared by Boswell and Trail, they recovered several bottles of bleach, a second sauna suit, duct tape, a human anatomy book, a fitted bedsheet like the flat bedsheet found at one of the disposal sites, and two roasting pans. No blood evidence was discovered in the apartment.

DNA tests were performed on several items of evidence collected from the various disposal sites. Results showed that Loofe was included as a contributor of DNA from blood found on one of the latex gloves, blood found on the towel, and blood found on torn pieces of denim clothing. Loofe could not be excluded as a possible contributor of DNA found on the other latex glove and on the star-patterned pajama pants. Trail was included as a possible contributor of DNA found on the extension cord, and both Trail and Boswell were possible contributors to DNA found on the large green shirt. After Boswell's arrest, a search of data stored on her cell phone revealed a photograph of Boswell wearing similar star-patterned pajama pants.

### 3. AUTOPSY

The recovered human body segments were positively identified as belonging to Loofe, and an autopsy was performed. The forensic pathologist who performed the autopsy testified that Loofe's body had been dismembered into 14 segments, 13 of which were recovered and examined. Most of the internal organs in Loofe's torso and abdomen were missing. The recovered body segments included Loofe's head and upper neck; her lower neck and upper torso; a "mid torso doughnut segment of skin and soft tissue" with some ribs and bone in the region of her belly button; her lower torso area, including her pelvis and hip joints; segments of her right and left thighs; her right and left lower legs from the calves to around the knees; her right and left forearms and hands; her right upper arm; and her left and right ankles and feet. More than 100 photographs, and multiple x rays, were taken of Loofe's body during the autopsy process.

Over Boswell's objections, the pathologist used some of the autopsy photographs and x rays to explain her findings and opinions to the jury. This testimony included findings about the areas where Loofe's body had been segmented; the type of instruments used to cut the flesh and bones; which cuts and marks were consistent with animal predation and which were consistent with a knife, hacksaw, or tin snips; which marks and bruises were recent; and the cause of Loofe's death. The pathologist determined the cause of death was homicidal violence by strangulation. She based this conclusion on the congestion of blood observed in the tissues of Loofe's head, petechial hemorrhaging observed in her forehead and in each of her eyes, and bleeding observed in all the layers of tissue in her lower neck. Abraded contusions around Loofe's wrists suggested the use of restraints.

### 4. Criminal Charges

Boswell and Trail were eventually arrested in Missouri after several weeks on the run. Both were ultimately charged with three felonies: premeditated first degree murder, conspiracy to commit first degree murder, and improper disposal of human skeletal remains. In Boswell's case, the State alleged the following overt acts in furtherance of the charged conspiracy to commit murder:

• Trail and Boswell solicited young females through social networking sites;
• Trail and Boswell recruited A.H., A.G., and K.B. to commit murder;
• Trail and Boswell selected a victim, to wit: Loofe and other unidentified persons, to murder;
• Trail and Boswell purchased materials used to kill and/or dismember Loofe; and
• Trail and Boswell disposed of Loofe's body.

### 5. Trial

In the fall of 2020, the charges against Boswell were tried to a jury over the course of several weeks. The State called more

than 40 witnesses and offered hundreds of exhibits in its case in chief, presenting much of the same evidence that had been admitted during the guilt phase of Trail's case in 2019.

In addition to the evidence already summarized above, the State offered the testimony of three young women—A.H., A.G., and K.B.—to prove both the first degree murder charge and the conspiracy charge. Relevant details of their testimony will be set out later in the opinion. The State's theory was that Boswell and Trail formed a conspiracy to murder someone for sexual gratification and that Loofe's murder was the result of that conspiracy. Central to the State's theory was evidence that in the summer and fall of 2017, Boswell and Trail used a dating app to solicit and recruit several young women, including A.H., A.G., and K.B., into dominant-submissive sexual relationships that included grooming the women, through physical and sexual punishment and regular discussions of witchcraft and the occult, to plan and participate in torture and murder for sexual gratification.

During the State's case in chief, Boswell objected to the admission of several categories of evidence, including (1) photographs of Loofe's dismembered body; (2) evidence regarding sex toys, sexual fantasies, and sexual torture; (3) testimony about witchcraft and the occult; and (4) certain statements made by Trail that were offered into evidence under the coconspirator exception to the hearsay rule.[2] Relevant details about this evidence, and the court's rulings on Boswell's objections, will be provided in the analysis of Boswell's specific assignments of error.

After the State presented its case in chief, Boswell rested without adducing any evidence. Closing arguments were delivered, instructions were given, and the matter was submitted to the jury. The jury returned unanimous guilty verdicts on all three charges.

---

[2] See Neb. Rev. Stat. § 27-801(4)(b)(v) (Reissue 2016).

### 6. Sentencing and Appeal

Boswell waived her right to a jury determination of the only aggravating factor alleged on the first degree murder charge, and the sentencing hearing was conducted before a three-judge panel.[3] Two members of the panel found the State had proved the alleged aggravator beyond a reasonable doubt, but one judge dissented. Consequently, on November 8, 2021, Boswell was sentenced to life imprisonment on the first degree murder conviction. The presiding trial judge then sentenced Boswell to consecutive prison terms of not less than 2 years nor more than 2 years on the conviction for improper disposal of human skeletal remains and not less than 50 years nor more than 50 years on the conviction for conspiracy to commit first degree murder.

Boswell appeals, represented by trial counsel.

## II. ASSIGNMENTS OF ERROR

All of Boswell's assigned errors challenge the admission of evidence during the guilt phase of her trial. She assigns, restated, that the court erred in admitting (1) photographs of Loofe's dismembered body; (2) evidence of sex toys, sexual fantasies, and sexual torture; (3) testimony of witchcraft and the occult; and (4) hearsay statements by Trail under the coconspirator exemption in § 27-801(4)(b)(v).

## III. STANDARD OF REVIEW

[1] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by those rules and judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[4]

[2] When judicial discretion is not a factor, whether the underlying facts satisfy the legal rules governing the

---

[3] See Neb. Rev. Stat. §§ 29-2520(3) and 29-2521(2) (Cum. Supp. 2022).

[4] See, *State v. Wood*, 310 Neb. 391, 966 N.W.2d 825 (2021); *State v. Estrada Comacho*, 309 Neb. 494, 960 N.W.2d 739 (2021).

admissibility of a proponent's evidence is a question of law, subject to de novo review.[5]

[3] Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.[6] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[7]

[4] An appellate court will review for abuse of discretion a trial court's evidentiary rulings on relevance, whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice, and the sufficiency of a party's foundation for admitting evidence.[8]

[5,6] The admission of photographs of a gruesome nature rests largely with the discretion of the trial court, which must determine their relevancy and weigh their probative value against their prejudicial effect.[9] An appellate court reviews the decision by a trial court to admit photographs of the victims' bodies for abuse of discretion.[10]

[7] An appellate court will review for abuse of discretion a trial court's evidentiary rulings on the admissibility of a defendant's other crimes or bad acts under Neb. Rev. Stat. § 27-404(2) (Reissue 2016), or under the inextricably intertwined exception to the rule.[11]

---

[5] *State v Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017).

[6] *Id*.

[7] *Estrada Comacho, supra* note 4.

[8] *Burries, supra* note 5. Accord, *State v. Lorello*, 314 Neb. 385, 991 N.W.2d 11 (2023) (trial court exercises its discretion in determining whether evidence is relevant and whether its probative value is outweighed by its prejudicial effect).

[9] *State v. Britt*, 305 Neb. 363, 940 N.W.2d 270 (2020).

[10] *Id*. See *State v. Galindo*, 278 Neb. 599, 774 N.W.2d 190 (2009).

[11] *Burries, supra* note 5.

[8,9] Hearsay is not admissible except as provided by the Nebraska Evidence Rules.[12] Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination to admit evidence over a hearsay objection or exclude evidence on hearsay grounds.[13] In a de novo review, an appellate court reaches a conclusion independent of the trial court.[14]

## IV. ANALYSIS

### 1. Objections to Photographs of Crime Scene and Autopsy

During the investigation, photographs of Loofe's dismembered body were taken at different times and for different purposes. Photographs taken during the recovery process generally documented the condition and location of the plastic trash bags and body segments as they were discovered by investigators at the various disposal sites. And photographs taken during the autopsy generally documented the condition of each body segment when it was delivered to, and as it was examined by, the pathologist.

At trial, the State offered multiple photographs of the various disposal sites during the testimony of the investigator who described the recovery process. And, during the testimony of the pathologist who performed the autopsy, the State offered multiple photographs and x rays relied upon by the pathologist to explain her findings. As this photographic evidence was offered, Boswell objected on grounds the photographs were irrelevant, were more prejudicial than probative, and were needlessly cumulative. The court held several

---

[12] *Id.*

[13] *In re Estate of Walker*, 315 Neb. 510, 997 N.W.2d 595 (2023); *State v. Reznicek*, 315 Neb. 272, 995 N.W.2d 204 (2023); *Burries, supra* note 5.

[14] *In re Estate of Walker, supra* note 13.

hearings in chambers to address the admissibility of the various photographs. Ultimately, the court received into evidence 15 photographs taken at the disposal sites, 35 photographs taken during the autopsy, and 8 photographs of x rays taken during the autopsy. The court excluded several photographs as cumulative.

On appeal, Boswell assigns that the trial court erred by "allowing numerous gruesome photograph[s] over Boswell's objections based on . . . §§ 27-404 and 403." We assume the reference in Boswell's assignment of error to "§ 27-404" was a typographical error, because her objections at trial, and her related arguments on appeal, focus on whether the photographs were relevant under Neb. Rev. Stat. § 27-401 (Reissue 2016), and whether they were unduly prejudicial or needlessly cumulative under Neb. Rev. Stat. § 27-403 (Reissue 2016). To address this assignment of error, we therefore confine our analysis to whether the district court erred in admitting the photographs over Boswell's objections under §§ 27-401 and 27-403. We begin by reviewing the legal principles that govern our analysis.

### (a) Governing Principles

[10,11] Under § 27-401, "[r]elevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The bar for establishing evidentiary relevance is not a high one; it requires only that the probative value of the evidence be something more than nothing.[15] Evidence is relevant if it tends in any degree to alter the probability of a material fact.[16] A trial court exercises its discretion in determining

---

[15] See, *Lorello, supra* note 8; *State v. Abligo*, 312 Neb. 74, 978 N.W.2d 42 (2022).

[16] *State v. Tucker*, 301 Neb. 856, 920 N.W.2d 680 (2018).

whether evidence is relevant and whether its probative value is outweighed by its prejudicial effect.[17]

[12,13] Under § 27-403, even when evidence is relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The probative value of evidence involves a measurement of the degree to which the evidence persuades the trier of fact that the particular fact exists and the distance of the fact from the ultimate issue of the case.[18] Unfair prejudice means an undue tendency to suggest a decision based on an improper basis.[19] The fact that evidence is prejudicial is not enough to require exclusion under § 27-403, because most, if not all, of the evidence a party offers is calculated to be prejudicial to the opposing party; it is only the evidence which has a tendency to suggest a decision on an improper basis that is considered unfairly prejudicial under § 27-403.[20]

The admission of photographs of a gruesome nature rests largely with the discretion of the trial court, which must determine their relevancy and weigh their probative value against their prejudicial effect.[21] An appellate court reviews the decision by a trial court to admit photographs of the victims' bodies for abuse of discretion.[22]

[14,15] When several photographs depict similar scenes from different angles as compared to other photographs in evidence, the general rule is that when a court admits

---

[17] *Lorello, supra* note 8.

[18] *State v. Thomas*, 303 Neb. 964, 932 N.W.2d 713 (2019).

[19] *State v. Oldson*, 293 Neb. 718, 884 N.W.2d 10 (2016).

[20] *State v. Mabior*, 314 Neb. 932, 994 N.W.2d 65 (2023). See *State v. Thomas, supra* note 18.

[21] *Britt, supra* note 9.

[22] *Id*.

photographs for a proper purpose, additional photographs of the same type are not unfairly prejudicial.[23] Section 27-403 does not require the State to have a separate purpose for every photograph,[24] and it requires a court to prohibit cumulative evidence only if its probative value is "substantially outweighed" by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.[25] With these principles in mind, we turn to Boswell's arguments that the photographs were not relevant, were more prejudicial than probative, and were needlessly cumulative.

### (b) Photographs Were Relevant

[16,17] In a homicide prosecution, a court may admit into evidence photographs of a victim for identification, to show the condition of the body or the nature and extent of wounds and injuries to it, and to establish an element of the crime.[26] In a first degree murder case, photographs can also provide visual proof from which a jury could reasonably infer that the homicide was committed purposely and with "deliberate and premeditated malice."[27]

Boswell contends that, aside from the photographs depicting petechial hemorrhaging of Loofe's head and restraint marks on her wrists, "none of the photographs were relevant" to Loofe's cause of death.[28] And Boswell argues that none of

---

[23] *Id.*

[24] See, *id.*; *State v. Dubray*, 289 Neb. 208, 854 N.W.2d 584 (2014).

[25] § 27-403.

[26] *Britt, supra* note 9; *State v. Jenkins*, 294 Neb. 684, 884 N.W.2d 429 (2016), *overruled on other grounds, State v. Cox*, 307 Neb. 762, 985 N.W.2d 395 (2020).

[27] See *State v. Stelly*, 304 Neb. 33, 47, 932 N.W.2d 857, 870 (2019) (internal quotation marks omitted). See, also, Neb. Rev. Stat. § 28-303(1) (Cum. Supp. 2022).

[28] Brief for appellant at 23.

the photographs were relevant to prove the identity of Loofe's killer or to prove any other controverted fact. These arguments are meritless.

The photographs taken at the various disposal sites provided direct evidence of the charged crime of improper disposal of human skeletal remains. And such photographs were also relevant to document the recovery process, to show chain of custody, to show the identity of the victim, to show the condition and location of the body segments and plastic trash bags as they were discovered by investigators, to assist in determining which body segments had been subjected to animal predation and which had not, and to support a finding of deliberate and premeditated malice.

Likewise, photographs and x rays documenting the autopsy process were relevant. The pathologist testified that the photographs helped her to explain her findings to the jury, including her findings as to the points of dismemberment, the type of tools/instruments used to dismember the body, which marks were consistent with animal predation and which were not, which portions of the body were still missing, and the cause and manner of Loofe's death. The autopsy photographs were also probative of deliberate and premeditated malice to the extent they showed dismemberment, recent bruising and blunt force trauma, a torn earlobe, marks consistent with wrist restraints, hemorrhaging consistent with strangulation, and cuts framing a tattoo on Loofe's arm that read "Everything will be wonderful someday."

The trial court did not abuse its discretion in overruling Boswell's relevancy objections to the challenged photographs and x rays.

### (c) Photographs Not Unduly Prejudicial

Boswell argues that even if the photographs were relevant, they should have been excluded under § 27-403. She makes two arguments in this regard. First, she contends the

photographs were so gruesome that any probative value was substantially outweighed by the danger of unfair prejudice. Second, she contends the photographs were needlessly cumulative. We consider each argument in turn, and ultimately reject them both.

Boswell's appellate brief argues generally that the graphic nature of the photographs served to "inflame the passions of the jury and anger them toward Boswell."[29] Her brief does not identify which specific photographs she is challenging in that regard, but we understand her argument to be focused primarily on photographs and x rays depicting Loofe's severed body, and we limit our analysis accordingly.

[18,19] We have often observed that gruesome crimes produce gruesome photographs.[30] That said, when the State lays proper foundation, photographs that illustrate or make clear a controverted issue in a homicide case are admissible, even if gruesome.[31] The gruesome nature of photographs alone will not keep them from the trier of fact, so long as the probative value is not outweighed by the prejudicial effect.[32]

We agree that the photographs of Loofe's recovered body were graphic and gruesome, but so too was the crime. The photographs accurately depict the stark reality of a horrific crime that involved strangulation, torture, dismemberment of the body into 14 segments, and disposal of those segments in plastic trash bags left in rural ditches and fields. Because the probative value of this photographic evidence was strong, as already discussed, we find no abuse of discretion in the trial court's conclusion that the probative value was not

---

[29] *Id*. at 15-16.

[30] See, *State v. Malone*, 308 Neb. 929, 957 N.W.2d 892 (2021), *modified on denial of rehearing* 309 Neb. 399, 959 N.W.2d 818; *Britt, supra* note 9; *Stelly, supra* note 27; *Jenkins, supra* note 26.

[31] *Id*.

[32] *State v. Parsons*, 226 Neb. 543, 412 N.W.2d 480 (1987).

substantially outweighed by the danger of unfair prejudice. This is particularly so because jurors are not fragile people, incapable of seeing gruesome evidence.[33]

[20] Finally, Boswell argues that even if the photographs were relevant and not more prejudicial than probative, they were needlessly cumulative and thus should have been excluded under § 27-403. Boswell's brief does not specifically identify which photographs she contends should have been excluded as needlessly cumulative. Instead, she tallies up the number of photographs depicting each recovered body segment and states the "number of photographs [was] not proportional to the number of dismembered segments."[34] But this argument assumes that, in a dismemberment case such as this, there is some acceptable ratio of admissible photographs to segmented body parts. There is not. To the contrary, we have held that the number of photographs, in and of itself, is not dispositive; rather, all the circumstances of each case must be considered in determining whether the admission in evidence of a significant number of photographs was so prejudicial that it constitutes reversible error.[35] When we consider all the circumstances here, including the nature of the crimes and the different purposes for which the various photographs were offered, we find no abuse of discretion based solely on the number of photographs received into evidence.

Although it is not necessary under § 27-403 to have a separate purpose for every photograph,[36] we find it significant that here, to the extent some of the photographs depicted the same body segment, they did so from different angles, at different points in the investigation, and they were used by the witnesses to illustrate different points of evidentiary

---

[33] See *Britt, supra* note 9.

[34] Brief for appellant at 24.

[35] *State v. Partee*, 199 Neb. 305, 258 N.W.2d 634 (1977).

[36] See *Stelly, supra* note 27.

significance.[37] Particularly in a crime such as this, where the victim was dismembered and multiple body segments were recovered from multiple disposal sites, it is not unreasonable to expect that the State would need to offer multiple photographs to document and explain the crime, the recovery process, the autopsy process, and the nature and significance of the multiple injuries. On this record, we can find no abuse of discretion in the number of photographs admitted into evidence.

## 2. Evidence of Sex Acts
### and Witchcraft

Boswell's primary arguments on appeal pertain to the admission of testimony and exhibits regarding various sexual acts and discussions of witchcraft and occult practices. Before trial, Boswell filed motions in limine seeking to prohibit the State from offering or introducing (1) "[a]ny testimony regarding witchcraft, sorcery, or the occult" and (2) any evidence of other bad acts or character, including "[a]ny mention of pornographic films, videos, CDs, vibrators, dildos, fake penises, sex toys, sexual lubricants, condoms, lingerie or restraints," and/or "[a]ny mention of [Boswell's] participating in sexual activity which includes discussion of torture, involves sadomasochistic activity, or the infliction of consensual physical punishment during sexual activity." For brevity, we will generally refer to this as the "sex and witchcraft evidence." Boswell

---

[37] See, e.g., *State v. Grant*, 293 Neb. 163, 190, 876 N.W.2d 639, 662 (2016) (holding admitting 11 autopsy photographs depicting body stabbed more than 50 times was not needlessly cumulative "because they each portray different wounds or angles" and it was "not unreasonable to expect that the State must show multiple pictures in order to document all or most of [victim's] numerous wounds"); *State v. White*, 244 Neb. 577, 589, 508 N.W.2d 554, 565 (1993) (holding despite admitting photographs of victim's body at crime scene, autopsy photographs were admissible to show nature and extent of wounds or injuries and were "necessary to understand this information"), *overruled on other grounds, Wood, supra* note 4.

generally argued this evidence was inadmissible because it was not relevant, it was improper character evidence, and it was more prejudicial than probative.

The State addressed much of the same sex and witchcraft evidence in a pretrial motion of its own, requesting a hearing "to determine the admissibility of evidence concerning other crimes, wrongs or acts committed by [Boswell] pursuant to . . . § 27-404(2)." The State's motion asserted this evidence was either inextricably intertwined with the charged crimes or was admissible to prove one or more of the purposes under § 27-404(2).

At a consolidated evidentiary hearing on these motions, the parties advised the court that most of the sex and witchcraft evidence would be adduced from three witnesses: A.H., A.G., and K.B. These witnesses had offered similar testimony during Trail's criminal trial, and transcripts of their prior trial testimony were received without objection. The parties generally agreed that the prior testimony of these witnesses was substantially similar to the testimony the State expected to adduce from the witnesses during Boswell's criminal trial.

In a written order, the court overruled Boswell's motion in limine as it related to the sex and witchcraft evidence. In finding the evidence was admissible, the court ruled in the alternative. First, it found that much of the sex and witchcraft evidence the State wanted to present was either "direct evidence of premeditation, and not subject to [§ 27-]404," or was "inextricably intertwined" evidence that formed part of the factual setting of the crime, and thus was not subject to § 27-404.[38] Alternatively, to the extent some of the sex and witchcraft evidence did not go to premeditation or was not inextricably intertwined with the charged crimes, the

---

[38] See *Mabior, supra* note 20 (holding § 27-404(2) does not apply to evidence of defendant's other crimes or bad acts if evidence is inextricably intertwined with charged crime).

court found such evidence was nevertheless admissible under § 27-404(2) to show motive and intent.

In its § 27-404 analysis, the court first found the State had shown by clear and convincing evidence that the sexual acts and discussions of witchcraft had occurred.[39] The court went on to conclude that the sex and witchcraft evidence was relevant and admissible under § 27-404(2) to prove motive or intent regarding both the conspiracy and the first degree murder charges. Finally, it determined that the probative value of the sex and witchcraft evidence was not substantially outweighed by the danger of unfair prejudice under § 27-403. The court's order instructed the State to advise the court at sidebar before presenting any sex and witchcraft evidence, so the court could give a limiting instruction to the jury.

During Boswell's trial, A.H., A.G., and K.B. were called to testify near the end of the State's case in chief, and Boswell renewed her objections to the sex and witchcraft evidence. The court overruled the objections, and it repeatedly instructed the jury that they were to consider the evidence of sexual activity, sexual items, and witchcraft only "for the purpose of motive or intent and for no other purpose, as in it is not evidence of anyone having a bad character or being a bad person or any other impugnment of their character." The court included a similar limiting instruction in the final jury instructions.

No party challenges the scope or sufficiency of the limiting instruction given by the trial court. And given the scope of the limiting instruction used at trial, we understand the court to have premised its ultimate admissibility determination exclusively on § 27-404(2). We see no indication in the record that, when admitting this evidence at trial over Boswell's objection, the court rested its determination on the alternative basis described in the motion in limine ruling—that some of

[39] See § 27-404(3).

the sex and witchcraft evidence was probative of premeditation or was inextricably intertwined with the charged crimes, and thus was not subject to § 27-404 at all. We thus limit our analysis to whether the court abused its discretion by admitting the challenged sex and witchcraft evidence under § 27-404(2) for the limited purposes of proving Boswell's motive or intent.

In the sections that follow, we summarize the testimony of A.H., A.G., and K.B., focusing on the testimony Boswell challenges on appeal and providing additional context as necessary. We then analyze the admissibility of such evidence under § 27-404(2).

(a) Testimony of A.H.

According to A.H., she began communicating with Boswell through the dating app in July 2017. At that time, A.H. was 20 years old. Very early in their communication, Boswell told A.H. about being in a relationship with Trail, and A.H. agreed to enter into a "sugar daddy" type relationship with Trail and Boswell. Under the arrangement, Trail gave A.H. a weekly allowance and various other gifts, and A.H. was expected to follow certain household rules, which included having sex with Boswell and Trail, staying overnight at the Wilber apartment once a week, being naked at the apartment, asking permission for everything, and checking in with Trail every 3 hours. A.H. was also expected to assist in a coin/antique business operated by Trail and Boswell. If A.H. did not follow the rules, she was physically punished by Trail.

In her testimony, A.H. described specific sexual encounters and conversations she had with Boswell and Trail. A.H. testified that Trail and Boswell kept an assortment of sex toys in a bedroom drawer in their apartment, and she identified a photograph of those items in an open drawer. A.H. testified that when she and Boswell engaged in sexual activities, Trail watched and sometimes participated. On one occasion,

Boswell directed A.H. to anally penetrate Trail with an inflatable sex toy while he appeared to be unconscious, and when she obeyed, she was told she had "torn something inside of him."

A.H. also described encounters and conversations relating to sexual torture. A.H. testified that Boswell told her she wanted to torture someone by cutting a hole in their stomach and then penetrating them with a sex toy and watching it come through the hole, and A.H. described Boswell as "joyful" when she described this torture. Trail asked A.H. to describe how she would torture someone, and she told him she would torture a man by cutting off his penis and sodomizing him with it.

A.H. also testified about regular conversations and interactions with Trail and Boswell involving witchcraft, becoming a witch, torture, and killing. A.H. testified that she understood Boswell was a witch and that Trail was a vampire who could fly and who controlled Boswell and 12 other witches. A.H. understood that to become part of the coven, one had to inhale another's last breath. A.H. believed that Trail could read her mind and erase her memory. She described incidents where Boswell and Trail appeared to be communicating with witches, including a time when Boswell was talking and laughing with witches during a car ride. A.H. understood there was a ceremony where the witches would go out to a field under a full moon and then leave their bodies to commit good or bad acts out in the world. She understood that another young woman, A.G., watched over the bodies of the witches during this ceremony.

A.H. testified that Trail and Boswell told her she would have to kill someone to gain her powers and become the 13th witch in the coven. In August 2017, Boswell and Trail took A.H. to a retail store to "scout" a young woman they met on a dating app. Trail talked with the young woman in the store and later asked A.H. if she wanted the young woman to be her first kill, and A.H. said she did. A week later, Trail told A.H. they would have to find someone else to kill because the woman

had left the state. At one point, Trail showed A.H. Boswell's "kill bag," which included a sauna suit and a hammer. Trail told A.H. that she would get her own kill bag and that its contents would be replenished after each kill.

A.H. testified that while she was in the arrangement with Trail and Boswell, she was introduced to A.G. According to A.H., in early September 2017, she and Boswell talked about killing A.G. because A.G. was "annoying" and was not following the rules. Around this time, Boswell also talked about killing Trail. A.H. said that by mid-September, she "snapped . . . back into reality" and decided to leave the arrangement with Boswell and Trail. She was warned that if she told anyone about the arrangement, she and her family would be killed.

(b) Testimony of A.G.

In the summer of 2017, A.G. met Boswell on the same dating app, a few months after A.G.'s high school graduation. Almost immediately, Boswell told A.G. about being in a "sugar daddy" type relationship with Trail. Within a few weeks, A.G. entered into an arrangement with Boswell and Trail, under which she was required to follow household rules similar to those described by A.H., and Trail gave A.G. a weekly allowance and other gifts, as well as a share of the profits from the coin/antique business Boswell and Trail operated. Under the arrangement, A.G. engaged in sexual acts with both Trail and Boswell. Boswell hit A.G. when she refused to do something asked of her.

A.G. testified that on numerous occasions, Boswell and Trail talked about witchcraft, the women in their coven, and their supernatural powers. A.G. also testified about discussions with Trail and Boswell involving torture and killing, including plans to make money by recording a "snuff film" of someone being tortured and killed.

A.G. testified that Trail claimed he was a vampire and that he was periodically possessed by different people. On at least one occasion, Trail claimed to have hypnotized Boswell.

A.G. testified that she left the arrangement with Trail and Boswell in mid-October 2017. She did not tell others about her experience because she was afraid Trail would harm her or her family.

(c) Testimony of K.B.

K.B. met Boswell on the same dating app in late October or early November 2017, when K.B. was 21 years old. Boswell almost immediately told K.B. about being in a "sugar daddy" type relationship with Trail. K.B. understood that Boswell and Trail were a "package deal" and that she had to be with both of them if she wanted a sexual relationship with Boswell. K.B. agreed to be in a dominant-submissive sexual relationship with Boswell that included specific household rules and physical and sexual punishment for violating the rules. In exchange, K.B. received a weekly allowance and other gifts.

K.B. described spending time with Boswell and Trail and engaging in sexual acts with them, including acts involving pain and discussions of torture during sex. Over Boswell's objection, K.B. testified that (1) Boswell anally penetrated her with a sex toy as a form of punishment; (2) Boswell directed her to use a sex toy to anally penetrate Trail while he was unconscious and she obeyed; and (3) during sex with Boswell, Trail told K.B. that Boswell would orgasm faster if K.B. described torturing someone, and when K.B. described rats eating through someone's bowels, Boswell appeared to orgasm quickly. K.B. also testified that Boswell was a powerful witch and that Boswell and Trail had many conversations with her about witchcraft.

In addition to the sex and witchcraft evidence, K.B. testified about events that occurred around the time of Loofe's disappearance and murder. According to K.B., Boswell and Trail had plans to pick her up in Omaha on November 16, 2017, but Boswell texted K.B. on that date and said she was "busy" and would instead pick up K.B. the next day. Boswell

also complained on November 16 that her shoulder was sore and that she was tired.

Boswell and Trail picked K.B. up on November 17, 2017, and drove her to a casino in Iowa, where they initially told K.B. she would need to prove herself by torturing and killing someone with Boswell. After leaving the casino, Trail and Boswell drove K.B. to different cities in Nebraska, including Omaha, Grand Island, and Kearney. According to K.B., they had multiple discussions about finding someone to kill, and Trail wanted to watch while Boswell and K.B. tortured and killed a college student. K.B. understood they were looking for an international student who would not be missed over the Thanksgiving holiday.

While in Kearney, K.B. received a voicemail message from the Lincoln Police Department, inquiring about her well-being, because K.B.'s mother was worried and had contacted police. When K.B. told Boswell and Trail about the call, they told her to shut off her cell phone, and the trio left Kearney and drove back to the casino in Iowa. At that point, K.B. learned that a young woman had gone missing and that Trail and Boswell were suspects. Boswell cried and said she "didn't hurt the girl." Boswell told K.B. she did not have a romantic relationship with the missing girl, but Trail had "fool[ed]" around with her. After K.B. was dropped off at the casino, she had no further contact with Boswell or Trail. K.B. testified she was afraid of Trail because he told her he would harm her and her family if she told anyone about their arrangement.

### (d) Photograph of Sex Toy

One of the items of evidence discovered by investigators at a disposal site was a sex toy. It was found near a white fleece jacket identified as the one Loofe was wearing at the time she disappeared. A photograph of this sex toy was admitted into evidence at trial over Boswell's objection. Her appellate brief mentions this photograph in passing but makes no specific

argument as to why its admission was improper. We therefore do not further address this evidence.[40]

## (e) Resolution

[21] Under § 27-404(1), evidence of a person's character or a trait of his or her character is not admissible for the purpose of proving that he or she acted in conformity therewith on a particular occasion. However, such evidence can be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.[41] Evidence that is admissible under § 27-404(2) may nevertheless be excluded under § 27-403 if its probative value is substantially outweighed by the danger of unfair prejudice.[42]

[22] An appellate court's analysis under § 27-404(2) generally considers (1) whether the evidence was relevant for some purpose other than to prove the character of a person to show that he or she acted in conformity therewith; (2) whether the probative value of the evidence is substantially outweighed by its potential for unfair prejudice; and (3) whether the trial court, if requested, instructed the jury to consider the evidence only for the limited purpose for which it was admitted.[43] As we explain, applying this framework, we find no abuse of discretion in concluding that the evidence of sexual acts and witchcraft was admissible under § 27-404(2) for the purpose of proving Boswell's motive and intent and that the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice under § 27-403.

[40] See, e.g., *State v. Clark*, 315 Neb. 736, 1 N.W.3d 487 (2024) (to be considered by appellate court, error must be both specifically assigned and specifically argued).

[41] § 27-404(2).

[42] *Thomas, supra* note 18.

[43] *State v. Matteson*, 313 Neb. 435, 985 N.W.2d 1 (2023); *State v. Chavez*, 281 Neb. 99, 793 N.W.2d 347 (2011).

[23-25] Motive is that which leads or tempts the mind to indulge in a criminal act.[44] And motive, even when not an element of the charged crime, is nevertheless relevant to the State's proof of the intent element of the crime.[45] Motive qualifies as a legitimate noncharacter theory under § 27-404(2) because although character carries a connotation of an enduring general propensity, a motive is a situationally specific emotion.[46]

[26] Intent is generally defined as "'[t]he state of mind accompanying an act.'"[47] Intent or knowledge is a statutory element of each of the crimes Boswell was charged with committing,[48] and thus, intent was an issue in this case.

Boswell argues that the sex and witchcraft evidence was classic "bad act" evidence because "atypical sexual conduct between Boswell, Trail and others . . . had very little probative value"[49] and "there was no relevant purpose for extensive, graphic descriptions of sexual encounters between the various members of the group."[50] She also contends that evidence of witchcraft and occult rituals was irrelevant and designed to evoke the type of hysteria observed in the "Salem Witch Trials of 1692" and that the State offered such testimony merely "to disgust and prejudice the jury against Boswell."[51]

The State disagrees. It argues that without the sex and witchcraft testimony from A.H., A.G., and K.B., "the jury

---

[44] *State v. Thomas, supra* note 18.

[45] *Id*.

[46] *Id*.

[47] *State v. Torres*, 283 Neb. 142, 157, 812 N.W.2d 213, 231 (2012), quoting Black's Law Dictionary 881 (9th ed. 2009).

[48] See, Neb. Rev. Stat. § 28-202 (Cum. Supp. 2022); § 28-303; Neb. Rev. Stat. § 28-1301 (Reissue 2016).

[49] Brief for appellant at 36.

[50] *Id.* at 38.

[51] *Id*. at 41.

would have been left with the impression that Loofe's murder and dismemberment was an 'inexplicable act of random violence.'"[52] The State contends that evidence of Boswell's prior sexual acts and the particular fantasies she described "not only revealed the sexually motivated explanation for the murder, but it provided context or explanation for the dildo and crotchless sauna suit bottom found at the disposal scenes in the same areas as Loofe's dismembered body parts, specifically her 'doughnut of skin' or abdomen."[53] The State also argues that the witchcraft evidence was an integral part of the recruitment process for the conspiracy to commit murder because what began as "'atypical' sexual conduct" progressed quickly to "discussions of witchcraft and other supernatural phenomenon for the purpose of introducing the idea of torture and killing."[54]

On this record, the sex and witchcraft evidence was not offered merely to show that Boswell had a propensity for engaging in "'atypical' sexual conduct"[55] or that she had a fascination with occult rituals and claimed to be a witch. Instead, the evidence was offered to show that Boswell got sexual gratification from controlling and torturing others, that prior to Loofe's murder Boswell was describing ways she wanted to torture and kill someone, and that Boswell and Trail had been actively recruiting and grooming others to participate in such a crime. The sex and witchcraft evidence was integral to explaining how Boswell and Trail methodically recruited and groomed young women to participate in the planned torture and killing of another person by using sexual control and punishment, gradually testing the boundaries of obedience, and introducing and normalizing discussions of occult

---

[52] Brief for appellee at 48-49.

[53] *Id*. at 49.

[54] *Id*. at 52.

[55] *Id*. at 49.

rituals, torture, and murder. This evidence was relevant and probative to show Boswell's motive and intent for engaging in the conspiracy and committing the murder with which she was charged, and we reject Boswell's argument to the contrary. And we find no abuse of discretion in the trial court's determination that the sex and witchcraft evidence had substantial probative value that was not outweighed by the danger of unfair prejudice, particularly given the limiting instruction repeatedly given by the trial court.

For the sake of completeness, we note the State also argues that some of the sex and witchcraft evidence was admissible either as direct evidence of premeditation on the first degree murder charge or as evidence that was inextricably intertwined with the charged crimes of conspiracy and murder, and thus necessary to present a coherent picture of those crimes. Because we understand the court's admissibility determination at trial to have rested exclusively on § 27-404(2), and because we have found no abuse of discretion in that determination, we do not address the State's alternative arguments.

### 3. Coconspirator Statements

Lastly, we turn to Boswell's argument that the district court erred in admitting testimony about certain out-of-court statements made by Trail. The court admitted this evidence as nonhearsay statements made by a coconspirator under § 27-801(4)(b)(v).

### (a) Additional Background

Before trial, Boswell filed a motion in limine seeking to prevent the State from offering any hearsay statements made by Trail to A.H., A.G., or K.B. without first having a hearing to determine admissibility. The State resisted the motion, arguing that Trail's statements were admissible as statements of a coconspirator under § 27-801(4)(b)(v). The district court deferred ruling on the motion until the time of trial.

[27,28] Pursuant to the coconspirator exception, a statement is not hearsay if it is "offered against a party and is . . . a statement by a coconspirator of a party made during the course and in furtherance of the conspiracy."[56] We have held that a statement is excluded from the definition of hearsay under the coconspirator exception if the State shows that (1) a conspiracy existed, (2) the declarant was a member of the conspiracy, (3) the party against whom the assertion is offered was a member of the conspiracy, (4) the assertion was made during the course of the conspiracy, and (5) the assertion was made in furtherance of the conspiracy.[57] We have also held that before a trier of fact may consider testimony under the coconspirator exception to the hearsay rule, a prima facie case establishing the existence of a conspiracy must be shown by independent evidence.[58]

In this case, the applicability of the coconspirator exception arose on the eighth day of trial, when the prosecutor began questioning A.H. to elicit statements made by Trail about finding someone to be A.H.'s first kill. Boswell objected to the question on the ground of hearsay. The court sustained the objection, and the State asked for a meeting in chambers.

Outside the presence of the jury, the State argued that Trail's statements to A.H. were admissible under the coconspirator exception to hearsay because the State had established, by that point in the trial, that a conspiracy to commit murder existed between Boswell and Trail. In response, Boswell argued that the State had not yet proved the existence of a conspiracy and that instead, it was trying to "bootstrap[]" Trail's statement to prove the existence of a conspiracy.

---

[56] § 27-801(4)(b)(v).

[57] See, *Estrada Comacho, supra* note 4; *State v. Britt*, 293 Neb. 381, 881 N.W.2d 818 (2016).

[58] *Estrada Comacho, supra* note 4.

After considering the parties' arguments, the district court expressly found the State had sufficiently proved the existence of a conspiracy through independent evidence regarding the conduct and actions of Boswell and Trail, as well as through statements made by Boswell, and thus, Trail's statements were admissible under the coconspirator exception to the hearsay rule. Boswell then requested, and was granted, a continuing objection to any testimony of A.H., A.G., and K.B. relating to statements made to them by Trail.

### (b) Specifically Assigned and Argued

On appeal, Boswell broadly argues that the State "impermissibly elicited hearsay statements [made] by Trail"[59] through the testimony of A.H., A.G., and K.B. and that the court erred in admitting such statements under the coconspirator exception. As to the specific statements being challenged, Boswell's appellate brief references the following categories: statements "regarding witchcraft or the occult and torture,"[60] statements "about Boswell's arousal being derived from discussions of torture,"[61] and statements "about how to make Boswell achieve an orgasm."[62] We decline to scour the record searching for statements that fall into one of these categories, and instead, we address only those statements that Boswell's appellate brief specifically identifies by annotation to the bill of exceptions and that were sufficiently argued in the brief.[63] We identify three such statements: (1) A.H.'s testimony that Trail asked her if she wanted a young woman they saw in a discount store to be her first kill; (2) K.B.'s testimony that Trail told her Boswell was a witch and that he was a powerful being who

---

[59] Brief for appellant at 43.

[60] *Id*.

[61] *Id*. at 44.

[62] *Id*. at 46.

[63] E.g., *Wood, supra* note 4.

could grant a wish; and (3) K.B.'s testimony that Trail told her that if she talked about torture while having sex with Boswell, Boswell would orgasm faster.

### (c) Nebraska's Coconspirator Rule

The coconspirator exception in § 27-801(4)(b)(v) was enacted by the Legislature in 1975, and essentially codified the common-law rule governing the admissibility of statements of a coconspirator.[64] Our 1977 decision in *State v. Bobo*[65] was the first time we discussed the coconspirator exception as codified by § 27-801, and we stated:

> The rule is well established that before the trier of facts may consider testimony under the coconspirator exception to the hearsay rule, a prima facie case establishing the existence of the conspiracy must be shown *by independent evidence*. . . . The purpose of requiring that the conspiracy be established by independent evidence is to prevent the danger of hearsay evidence being lifted by its own bootstraps, i. e., relying on the hearsay statements to establish the conspiracy, and then using the conspiracy to permit the introduction of what would otherwise be hearsay testimony in evidence.

At the time we decided *Bobo*, the language of § 27-801(b)(b)(v) was substantively similar to the language of the corresponding Fed. R. Evid. 801(d)(2)(E), which provided that a statement

[64] *State v. Bobo*, 198 Neb. 551, 556-67, 253 N.W.2d 857, 861 (1977) (reciting pertinent statutory language and noting that "[t]his was the rule in Nebraska even prior to the enactment of section 27-801 in 1975"). See, also, *O'Brien v. State*, 69 Neb. 691, 96 N.W. 649 (1903) (stating rule is that acts and declarations of one conspirator are not evidence against another unless conspiracy is established).

[65] *Bobo, supra* note 64, 198 Neb. at 557, 253 N.W.2d at 861 (emphasis supplied), citing *State v. Merchants Bank*, 81 Neb. 704, 116 N.W. 667 (1908). See *United States v. Nixon*, 418 U.S. 683, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974).

is not hearsay if made "'by a coconspirator of a party during the course and in furtherance of the conspiracy.'"[66] In addition, when we decided *Bobo*, our application of the coconspirator rule was consistent with the U.S. Supreme Court's application of the provisions in Fed. R. Evid. 801.[67]

Ten years after our decision in *Bobo*, the U.S. Supreme Court decided *Bourjaily v. United States.*[68] That case held, among other things, that Congress' enactment of the Federal Rules of Evidence, and in particular Fed. R. Evid. 104(a) and Fed. R. Evid. 1101(d), effectively abrogated the common-law prohibition against bootstrapping.[69] The Court reasoned this was so because the existence of a conspiracy is a preliminary question concerning admissibility of evidence, and rules 104(a) and 1101(d) expressly provide that preliminary questions as to the admission of evidence are not subject to the rules of evidence. Based on the language of rules 104(a) and 1101(d), *Bourjaily* reasoned "there is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy."[70] *Bourjaily* declined to decide whether a court could rely solely upon

---

[66] See *Bourjaily v. United States*, 483 U.S. 171, 173, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987).

[67] See *id.*, citing *Nixon, supra* note 65. See, also, *Glasser v. United States*, 315 U.S. 60, 62 S. Ct. 457, 86 L. Ed. 680 (1942) (superseded by rule as stated in *Bourjaily, supra* note 66).

[68] *Bourjaily, supra* note 66.

[69] See, Fed. R. Evid. 104(a) ("[p]reliminary questions concerning . . . the admissibility of evidence shall be determined by the court . . . . In making its determination it is not bound by the rules of evidence except those with respect to privileges"); Fed. R. Evid. 1101(d) (stating that other than with respect to privilege, federal rules of evidence shall not apply to "the court's determination, under Rule 104(a), on a preliminary question of fact governing admissibility").

[70] *Bourjaily, supra* note 66, 483 U.S. at 180.

hearsay statements to determine whether a conspiracy had been proved, but held:

> To the extent that [the bootstrapping rule] meant that courts could not look to the hearsay statements themselves for any [preliminary] purpose, it has clearly been superseded by Rule 104(a). It is sufficient for today to hold that a court, in making a preliminary factual determination under [the coconspirator hearsay exemption], may examine the hearsay statements sought to be admitted.[71]

Ten years after the Court's decision in *Bourjaily*, Fed. R. Evid. 801(d)(2)(E) was amended. It now provides that an opposing party's statement is not hearsay if it is offered against the opposing party and "was made by the party's coconspirator during and in furtherance of the conspiracy. The [opposing party's] statement must be considered but does not by itself establish . . . the existence of the conspiracy or participation in it . . . ."[72]

We note the Nebraska Legislature has not amended § 27-801, to include language similar to the current Fed. R. Evid. 801(d)(2)(E). And unlike Fed. R. Evid. 104 and 1101, neither Neb. Rev. Stat. § 27-104 (Reissue 2016) nor Neb. Rev. Stat. 27-1101 (Reissue 2016) expressly states that courts are not bound by the rules of evidence when deciding preliminary questions of admissibility.[73] Perhaps because of these distinctions between Nebraska law and federal law, Nebraska appellate courts have cited *Bourjaily* but have not directly considered the effect of *Bourjaily*, if any, on the bootstrapping rule in Nebraska's coconspirator jurisprudence.

---

[71] *Id.*, 483 U.S. at 181.

[72] Fed. R. Evid. 801(d)(2)(E).

[73] But see *State v. Piper*, 289 Neb. 364, 372, 855 N.W.2d 1, 8 (2014) (noting that despite differing language, § 27-104 "was never intended to treat preliminary questions of admissibility differently than Fed. R. Evid. 104(a)").

Instead, most of our post-*Bourjaily* cases have continued to prohibit bootstrapping and have required the State to prove the existence of a conspiracy using independent evidence before a coconspirator's statement could be admitted under § 27-801(4)(d)(v).[74]

But the State's brief on appeal directs us to language in a few post-*Bourjaily* cases,[75] which the State reads as softening Nebraska's bright-line rule against bootstrapping. The State suggests this language has caused confusion about the current status of the rule against bootstrapping in Nebraska, and it urges us to "specifically disapprove of"[76] our cases endorsing a bright-line rule and instead align our coconspirator jurisprudence with current federal law.

We are not persuaded it is necessary, in this appeal, to address whether a trial court may consider the hearsay statement of a coconspirator when determining whether a conspiracy has been established. That is so because, as we discuss next, this appeal does not present an issue of bootstrapping.[77]

---

[74] See, e.g., *State v. Trail, supra* note 1; *State v. Torres, supra* note 47; *State v. Hudson*, 279 Neb. 6, 775 N.W.2d 429 (2009).

[75] See, *Estrada Comacho, supra* note 4, 309 Neb. at 521, 906 N.W.2d at 758-59 (citing *Bourjaily* and stating "although the [hearsay] statements themselves cannot be the sole evidence to support the existence of conspiracy, the statements can be part of the determination so long as there is also evidence independent of the statements to show a conspiracy"); *State v. Henry*, 292 Neb. 834, 874, 875 N.W.2d 374, 403 (2016) (stating "a correct evidentiary ruling will not be reversed simply because the foundational proof came at the wrong time . . . [a]nd there is no bright-line requirement that the independent evidence of a conspiracy must precede the admission of coconspirator statements"). See, also, *State v. Pullens*, 281 Neb. 828, 800 N.W.2d 202 (2011) (citing *Bourjaily* and finding no prohibition against bootstrapping in making preliminary determinations related to excited utterance hearsay exception).

[76] Brief for appellee at 55.

[77] See *State v. Jedlicka*, 297 Neb. 276, 900 N.W.2d 454 (2017) (appellate court not obligated to engage in analysis not necessary to adjudicate case before it).

(d) Statements Were Admissible

Here, when making the preliminary finding that the State proved the existence of a conspiracy so that admission of Trail's statements met the requirements of § 27-801(4)(b)(v), the trial court expressly stated it was not relying on any of Trail's statements. Instead, the trial court relied solely on independent evidence already adduced by the State.

The record shows that before attempting to introduce any of the three statements made by Trail that Boswell challenges on appeal, the State adduced extensive evidence of receipts, credit/debit card records, cell phone records, and other testimony that linked Boswell and Trail to A.H., A.G., K.B., and Loofe. Additionally, the State adduced considerable evidence that Boswell and Trail engaged in overt acts of recruiting and grooming young women to assist them in planning and committing murder for sexual gratification and that Trail and Boswell purchased materials used to commit the murder, dismembered and disposed of the body to cover up the crime, and went on the run to evade law enforcement. Limiting our review to only the evidence adduced by the State prior to the time it sought to introduce Trail's three statements, we find no clear error in the court's determination that the State had proved the existence of a conspiracy by a preponderance of the evidence. And having conducted our own de novo review, we agree with the trial court's ultimate determination that Trail's statements were admissible as statements of a coconspirator under § 27-801(4)(b)(v).

Boswell makes one additional argument related to the coconspirator exception that we address: She argues that Trail's statement to K.B., indicating that Boswell would orgasm faster if K.B. talked about torture, was inadmissible because it was not made in furtherance of the conspiracy. We find this argument unpersuasive. It is apparent from the record that Boswell and Trail were involved in a conspiracy to torture and kill another for sexual gratification. As such, a statement by Trail that Boswell found torture to be sexually gratifying was a

statement in furtherance of the conspiracy. The district court did not err in admitting Trail's statements under the coconspirator exemption.

## V. CONCLUSION

For the foregoing reasons, there is no merit to any of Boswell's assigned errors regarding the trial court's evidentiary rulings. We therefore affirm Boswell's convictions and sentences.

Affirmed.